| | |
|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an Indiana Unincorporated Association, <br><br> Plaintiff, <br><br> v. <br><br> DRAFTKINGS, INC., a Nevada Corporation <br><br> Defendant. | Case No. 1:26-CV-557 <br><br> **COMPLAINT FOR TRADEMARK INFRINGEMENT, TRADEMARK FALSE ASSOCIATION AND UNFAIR COMPETITION, AND DILUTION** <br><br> **JURY TRIAL DEMANDED** |

COMES NOW Plaintiff National Collegiate Athletic Association ("Plaintiff" or the "NCAA"), and for its Complaint against Defendant DraftKings, Inc. ("DraftKings" or "Defendant"), respectfully states as follows:

## NATURE OF ACTION

1. This is an action for trademark infringement, trademark false association and unfair competition, and trademark dilution, in violation of 15 U.S.C. §§ 1114 and 1125. The NCAA seeks, among other remedies, preliminary and permanent injunctive relief, damages, and such other relief as the Court deems just and equitable under the circumstances.

2. The NCAA operates the NCAA Division I Men's and Women's Basketball Tournaments (collectively, the "Tournaments"), among the most famous and widely recognized sporting events in the United States, commanding nationwide attention each year and standing as cultural institutions synonymous with college basketball excellence and national spectacle.

3. The Tournaments exert enormous cultural and economic influence by shaping national sports conversation, driving massive media viewership and advertising revenue,

1

energizing universities and local economies, and have become an annual shared experience that extends far beyond college basketball fans.

4.     In connection with the Tournaments, the NCAA extensively uses and promotes its federally protected MARCH MADNESS®, FINAL FOUR®, ELITE EIGHT®, and NCAA SWEET SIXTEEN® trademarks to identify, brand, advertise, and distinguish the Tournaments across broadcast media, digital platforms, merchandise, sponsorships, and licensed commercial activities nationwide.

5.     The NCAA has purposefully avoided any appearance of affiliation with gambling companies—including by declining sportsbook sponsorships, banning sports betting by student-athletes and staff, opposing highly damaging prop bets and micro-bets, and launching initiatives such as its "Draw the Line" campaign—because preventing harassment and improper influence in college sports, and preserving the integrity, reputation, and goodwill of the NCAA championships require a firm separation from commercial gambling.

6.     Defendant DraftKings is a for-profit sports betting and online gambling company that aggressively markets and monetizes wagering products tied to major sporting events nationwide, including the Tournaments, through an array of pervasive advertising campaigns that push gambling participation among vulnerable populations.  Additionally, through its promotion of highly specific prop bets and micro-bets, DraftKings creates incentives and opportunities that threaten the integrity of competitions by exposing student-athletes to improper influence, pressure, and inducements to manipulate on-court conduct.

7.     DraftKings recently adopted and began using the NCAA's federally registered MARCH MADNESS®, FINAL FOUR®, ELITE EIGHT®, and NCAA SWEET SIXTEEN® trademarks, as well as confusingly similar variations thereof, including without limitation

MARCH MANIA, in connection with such gambling services, without authorization, and in a manner that is intended to and does falsely suggest an association with, sponsorship by, or approval of DraftKings by the NCAA, and that further dilutes and tarnishes the distinctive quality and reputation of those famous marks by linking them to commercial gambling activity.

8. The unauthorized use and infringement of the NCAA's famous trademarks, false suggestion of an association with or sponsorship by the NCAA, and tarnishment of the NCAA's and its famous trademarks' reputations by affiliating them with gambling in the minds of consumers, is causing immediate and irreparable harm to the NCAA by eroding control over its brands, undermining the integrity and goodwill of its championships, and falsely linking the NCAA to commercial gambling activity it has expressly rejected. Injunctive relief is necessary to prevent ongoing and escalating damage that cannot be remedied by money damages alone.

## THE PARTIES

9. Plaintiff The National Collegiate Athletic Association is a non-profit unincorporated association with its principal place of business at 700 W. Washington St., Indianapolis, IN 46204.

10. Defendant DraftKings, Inc. is, on information and belief, a corporation organized and existing under the laws of the State of Nevada, having a principal place of business at 222 Berkeley St, Boston, MA 02116.

11. DraftKings operates interactive websites and mobile phone applications that are offered and accessible nationwide and are intentionally marketed, directed, and made available to individuals throughout the United States, including consumers within this judicial district.

**JURISDICTION AND VENUE**

12. This Court has original subject matter jurisdiction over the NCAA's claims pursuant to 28 U.S.C. §§ 1331 and 1338, and 15 U.S.C. §§ 1116 and 1121.

13. This Court has personal jurisdiction over this dispute pursuant to, *inter alia*, 15 U.S.C. §§ 1116, 1117, 1121 & 1125. On information and belief, DraftKings is doing business in this judicial district and has wrongfully used and continues to wrongfully use the NCAA's trademarks and/or confusingly similar variations in this judicial district and elsewhere and has wrongfully diluted the NCAA's trademarks in this judicial district and elsewhere, to falsely suggest an association with or sponsorship by the NCAA and in a manner which dilutes and tarnishes those trademarks.

14. Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action, on information and belief, occurred and are occurring in this judicial district, a substantial part of the property that is the subject of the action is situated in this judicial district, and DraftKings is subject to personal jurisdiction in this judicial district. On information and belief, DraftKings has wrongfully used, infringed, diluted, and upon information and belief, continues to wrongfully use, infringe, and dilute the NCAA's valuable trademarks in this judicial district.

**FACTS COMMON TO ALL COUNTS**

**Plaintiff The National Collegiate Athletic Association**

15. Founded in 1906, the NCAA has for more than a century served as the steward of collegiate athletics, fostering fair competition, academic excellence, and athletic opportunity, while shaping college sports into one of the most respected and enduring institutions in American life.

16. Today, the NCAA is the largest collegiate athletics governing body in the United States, coordinating competition and governance for more than 1,100 colleges and universities, roughly 500,000 participating student-athletes, and 92 championship events across three divisions and 24 distinct sports.

17. While its mission has grown, the NCAA's guiding purpose has remained constant: supporting member schools to provide a world-class athletics for student-athletes and maintaining the integrity and fairness of intercollegiate athletic competition.

18. Consistent with that mission, the NCAA has developed and oversees the NCAA Division I Men's Basketball Tournament—first held in 1939—which has grown into a premier national sporting event and a defining feature of the American sports landscape.

19. In 1982, the NCAA expanded to include the Division I Women's Basketball Tournament, which has likewise also grown into a premier national sporting event and a defining feature of the American sports landscape.

20. Today, the fields of both Tournaments include 68 teams each competing in a single-elimination format across four regional brackets, culminating in the National Championship games.

21. Held annually over approximately three weeks each spring and broadcast nationwide across multiple television and digital platforms, the Tournaments attract tens of millions of viewers each year and rank among the most-watched and commercially significant sporting events in the United States.

22. The NCAA broadcasts coverage of the Tournaments nationwide, through free television broadcasts, common cable, and streaming subscription services. In 2025 alone, the men's national semi-final games offered under the FINAL FOUR® mark averaged 15.3 million viewers, and the men's Championship Game had approximately 16 million viewers.

23. In-person attendance at the 2025 NCAA Division I Men's Basketball Tournament exceeded 700,000 for the third consecutive year.

**The NCAA Basketball Marks**

24. Throughout the 1970s, 80s, 90s, and beyond, the NCAA adopted and began using a number of trademarks in connection with its Tournaments, including MARCH MADNESS® (starting at least as early as 1982); FINAL FOUR® (starting at least as early as 1977); ELITE EIGHT® and ELITE 8™ (starting at least as early as 1993); NCAA SWEET 16®, NCAA SWEET SIXTEEN®, and SWEET 16™ (starting at least as early as 1998); and NCAA MARCH MADNESS & Design (reproduced below, starting at least as early as 2016) (collectively, the "NCAA Basketball Marks"), which through continuous, prominent, and exclusive use have become iconic source-identifiers uniquely associated with the NCAA and its Tournaments.



25. To further protect its extremely valuable NCAA Basketball Marks, and put others on further notice of its ownership and rights in, to, and under its NCAA Basketball Marks, the NCAA has acquired a number of U.S. federal trademark registrations and owns a pending trademark application for its NCAA Basketball Marks, including, without limitation:

- MARCH MADNESS® (U.S. Reg. No. 2,485,443) for "*entertainment in the nature of basketball tournaments between college teams*" in International Class 41;

- MARCH MADNESS® (U.S. Reg. No. 1,571,340) for "*entertainment services, namely, presentation of athletic and entertainment personalities in a panel forum*" in International Class 41;

- MARCH MADNESS® (U.S. Reg. No. 3,025,527) for "*providing sports information via the Internet*" in International Class 41, among others;

- FINAL FOUR® (U.S. Reg. No. 1,488,836) for "*association services, namely, conducting annual basketball tournaments at the college level*" in International Class 41;

- FINAL FOUR® (U.S. Reg. No. 2,377,720) for "*promoting the goods and services of others by allowing sponsors to affiliate their goods and services with collegiate championship tournaments*" in International Class 35;

- FINAL FOUR® (U.S. Reg. No. 2,964,266) for "*entertainment services, namely, providing information in the field of college sports via the Internet*" in International Class 41, among others;

- ELITE EIGHT® (U.S. Reg. No. 2,031,593) for "*conducting annual basketball tournaments at the college level*" in International Class 41;

- ELITE EIGHT® (U.S. Reg. No. 8,169,726) for "*entertainment services, namely, organizing and conducting an array of athletic events rendered live and recorded for the purpose of distribution through broadcast media*" in International Class 41, among others;

- ELITE 8™ (U.S. App. Ser. No. 99/495,469) for "*entertainment services, namely, organizing and conducting an array of athletic events rendered live and recorded for the purpose of distribution through broadcast media*" in International Class 41, among others;

- NCAA SWEET 16® (U.S. Reg. No. 3,165,572) for "*entertainment services, namely, organizing and promoting intercollegiate basketball games, and intercollegiate basketball tournaments*" in International Class 41;

- NCAA SWEET SIXTEEN® (U.S. Reg. No. 5,423,610) for "*entertainment services, namely, organizing intercollegiate basketball games and intercollegiate basketball tournaments; providing sports information via the Internet*" in International Class 41, among others; and

- ® (U.S. Reg. No. 6,768,187) for "*entertainment in the nature of basketball tournaments between college teams; entertainment services, namely, presentation of athletic and entertainment personalities in a panel forum; providing sports information via the internet; providing an interactive website featuring information related to entertainment and athletic sporting contests, games, exhibitions and events; entertainment services, namely, production and distribution of television programs relating to sports and sports entertainment*" in International Class 41.

26. With respect to U.S. Reg. Nos. 2,485,443; 1,571,340; 3,025,527; 1,488,836; 2,377,720; 2,964,266; 2,031,593; 3,165,572; and 5,423,610, each of these NCAA Basketball Marks have become "incontestable" under 15 U.S.C. § 1065. The NCAA's ownership of incontestable U.S. trademark registrations for its NCAA Basketball Marks is "conclusive evidence of the validity of the … mark[s] …, of [the NCAA's] ownership of the mark[s], and of [the NCAA's] exclusive right to use the registered mark[s] in commerce." 15 U.S.C. § 1115(b).

27. True and accurate copies of the U.S. Registration Certificates and extracts from the USPTO database for each of the above U.S. federal trademark registrations for the NCAA Basketball Marks are collectively attached hereto as **Exhibit A**.

28. The NCAA Basketball Marks are among the most widely recognized and commercially valuable trademarks in American sports.

29. For more than four decades, the NCAA has expended, and continues to expend, a substantial amount of resources, money, time, and effort promoting, marketing, advertising, and building consumer recognition and goodwill in its extremely valuable NCAA Basketball Marks.

30. Indeed, the NCAA and its corporate sponsors and affiliates have invested hundreds of millions of dollars in advertising, marketing, and widely publicizing its NCAA Basketball Marks in connection with the NCAA's provision of the Tournaments.

31. Through decades of sustained investment in branding, marketing, and promotion, the NCAA has transformed the NCAA Basketball Marks into nationally dominant identifiers, yielding not only one of the most widely watched sporting events in the United States, but also extensive and continuous press and media coverage that reinforces the strength and prominence of those trademarks.

32.     More than 100 million fans of the Tournaments have attended or viewed broadcasts of the Tournaments over the course of just the past decade of use, and each of those fans—and the general public—encounters the NCAA Basketball Marks in many prominent and highly visible ways.

33.     For instance, the NCAA Basketball Marks are extensively and repeatedly displayed throughout the tournament experience, including on venue branding and in-arena fixtures, incorporated into the playing surface and official game equipment, featured on player uniforms and tournament materials, and disseminated nationwide through broadcast partners and authorized corporate sponsors licensed to use the NCAA Basketball Marks to identify the NCAA as the source of the championship events during and beyond the Tournaments:








34.     Beyond the extensive public visibility generated by the Tournaments, the NCAA Basketball Marks serve as powerful commercial assets generating hundreds of millions of dollars in revenue annually. That revenue constitutes the NCAA's principal funding source for administering championship events and providing financial support to student-athletes across all 92 NCAA-sponsored sports championships.

35.     Even a limited review of coverage by major U.S. newspapers, including outlets such as *USA Today*, the *Chicago Tribune*, and the *New York Post*, for example, each of which enjoys daily readerships exceeding 100,000, reveals nearly 10,000 published articles referencing the NCAA Basketball Marks in connection with the Tournaments.

36.     Lifetime press coverage, upon information and belief, likely exceeds hundreds of thousands of articles and other news publications, and consumer impressions—whether from viewing the Tournaments' games, promotional and advertising materials, social media posts and engagement, or press attention—likely exceeds 300 million.

37.     The NCAA also actively polices unauthorized uses of its NCAA Basketball Marks, enforcing its marks rigorously for more than four decades to protect its extremely valuable trademark rights, including through sending cease and desist letters, filing opposition and cancellation actions at the U.S. Patent and Trademark Office's Trademark Trial and Appeal Board,

and, when warranted, as here, by filing federal trademark infringement lawsuits in U.S. District Courts.

38. And, with respect to licensing activities, the NCAA is *highly selective* in choosing third parties to authorize to use its famous NCAA Basketball Marks, maintaining strong control over and imposing strict requirements on licensees' use, to ensure its authorized licensees as well as their use, are supportive of the NCAA's values and do not conflict with its mission and fundamental principles.

39. There can be no legitimate dispute that the NCAA Basketball Marks are extremely valuable and have acquired substantial secondary meaning in the marketplace, and no dispute that the NCAA has exclusive common law rights in, to, and under its NCAA Basketball Marks throughout the United States.

**The NCAA's Position Against Gambling**

40. Since its inception, the NCAA has refused to align its brand, Tournaments, or the participating student-athletes with sports betting, reflecting a core institutional principle and formal policy, as well as the NCAA's strongly held belief that sports betting jeopardizes competitive integrity, endangers student-athletes, and invites manipulation of games.

41. This position is based on the NCAA's awareness and documentation of tangible gambling-related harm to student-athletes, including a 2025 study that found 36% of Division I men's basketball student-athletes, many of whom are underage, experienced betting-driven social media abuse and 29% encountered bettors on campus, alongside evidence of threats, harassment, and heightened risks of game manipulation tied to player-specific wagering.

42. The same study showed that almost half of Division I men's basketball student-athletes (46%) experienced online, verbal, or physical abuse tied to betting losses; 14% reported

experiencing betting-related abuse and feeling increased stress, anxiety, or burnout as a result; and 18% reported a reduction in the enjoyment of playing their sport.

43. Instead, consistent with its policy, the NCAA's Advertising and Promotional Standards categorically bar any sports wagering advertising or promotion in connection with NCAA events or marks, including the absence of gambling sponsorships, advertising placements, or authorized uses of the NCAA Basketball Marks for sports betting purposes of any kind.

44. Further, the NCAA has aggressively pressed state gambling regulators to ban player proposition bets and other high-risk wagering tied to its competitions, warning that such bets present a heightened risk of harm to student-athletes and NCAA competitors.

45. And, through its Draw the Line campaign—a comprehensive, NCAA-sponsored initiative designed to support member schools in their effort to educate student-athletes, coaches, and campus communities about the risks of sports wagering—the NCAA combats gambling-related harm by monitoring more than 22,000 competitions each year, delivering educational programming to member schools, operating anti-harassment protections, and aggressively advocating and pressing state gambling regulators for bans on player proposition bets and other high-risk wagering tied to its competitions—efforts that have already led multiple states to prohibit individual student-athlete prop bets.

46. At no time has the NCAA authorized, accepted, or maintained any sponsorship, endorsement, or affiliation with DraftKings—or any sports wagering operator—including regarding use of the NCAA Basketball Marks.

**Defendant DraftKings**

47. On information and belief, Defendant DraftKings launched in 2012 and is a for-profit sports betting and online gambling company that operates nationwide through web-based

and mobile platforms, generating revenue by aggressively marketing, facilitating, and monetizing high-volume wagering on sporting events through data-driven promotions, expansive betting markets, and constant consumer engagement.

48. On information and belief, DraftKings operates a centralized digital gambling platform through its consumer-facing website and mobile applications, which are designed to provide continuous access to sports wagering by presenting features like real-time odds, extensive betting menus, personalized promotions, and live betting functionality, to drive frequent and sustained betting activity.

49. On information and belief, DraftKings offers a wide array of wagering options—including bets on professional and collegiate sports and tournaments—such as full-game and series outcomes, conference and national championships, futures bets, in-game and live betting, player-specific proposition bets, micro-bets tied to discrete plays or statistics, and other specialty markets designed to monetize virtually every aspect of athletic competition.

50. On information and belief, DraftKings's minimum bet is ten U.S. cents and is accessible to anyone nationwide, subject only to state gambling restrictions.

51. One such bet type offered by DraftKings are player proposition bets, or "prop" bets, which are wagers on discrete, player-specific or in-game events—such as how many points, rebounds, assists, or turnovers an individual athlete records—that are settled independently of the game's final outcome and focus attention on isolated aspects of a player's performance rather than team competition.

52. In the collegiate context, such bets are particularly harmful because they place direct financial stakes on the actions of individual student-athletes, increase exposure to

harassment and pressure from bettors, and create incentives for improper influence that undermine athlete well-being and the integrity of college sports.

53. Player proposition bets and other similar micro-bets are fundamentally incompatible with—and directly contrary to—the NCAA's long-standing policies and core values rejecting sports betting.

54. Accordingly, the NCAA has taken sustained and aggressive action to curb and outlaw player proposition bets by documenting their harms, support member schools efforts to educate student athletes, monitoring competitions, and pressing state regulators to ban high risk wagering.

**Defendant's Infringement of the NCAA Basketball Marks**

55. On the eve of the Tournaments, DraftKings deliberately adopted and prominently began using the NCAA's iconic NCAA Basketball Marks, including confusingly similar variations thereof, to trade on—and usurp—the immense goodwill, recognition, and consumer trust embodied in those Marks at the precise moment of peak public attention.

56. DraftKings's unlawful use quickly proliferated across its consumer-facing websites and mobile applications, embedding the marks and logos into betting menus, promotional graphics, and marketing publications, to deliberately exacerbate consumer confusion and reinforce a false association with or sponsorship by the NCAA in order to continuously capitalize on the goodwill of the NCAA:













College Basketball Teams

NCAA Division I
Vermont

AAC
Charlotte · East Carolina · Florida Atlantic · Memphis

SWAC
SUMMIT
SUNBELT
WCC
WAC









$50,000 IN TOTAL PRIZES
FEB.–NOV. • NASCAR • 21+
PLAY FREE
Trademarks owned by Becle, S.A.B. de C.V. ©2026 Proximo, cuervo.com. Please drink responsibly.

**DKN DRAFTKINGS NETWORK**

News ⌄    Betting Picks ⌄    Fantasy Advice ⌄    Shows ⌄    Pop Culture ⌄    |    🔍

Betting Picks   Fantasy Advice   Betting Splits   Parlay Picks Optimizer   NBA Injuries   NFL Injuries   NFL Consistency Sheets   NBA Consistency Sheets   Parlays   Player Props   Odds, Lines & Spreads

# DRAFTKINGS 2026 MARCH MANIA SURVIVOR CONTEST OFFICIAL RULES

DRAFTKINGS NETWORK

Published Feb 16, 2026 5:42 PM EST

By DK Network Editors

GET $25 IN DK DOLLARS  OPT IN
WHEN YOU OPT IN THEN VENMO TRANSFER $50
OFFER VALID 3/1/26–4/30/26. MAX 12,000 REDEMPTIONS.
TERMS APPLY. FIRST-TIME TRANSFER OR FIRST TRANSFER IN 3+ MONTHS.
GAMBLING PROBLEM? CALL 1-800-GAMBLER OR 877-8-HOPENY/TEXT HOPENY (467369) (NY).
HELP IS AVAILABLE FOR PROBLEM GAMBLING. CALL (888) 789-7777 OR VISIT CCPG.ORG (CT).
18+ in most eligible states, but age varies by jurisdiction. Eligibility restrictions apply. Void where prohibited. See www.draftkings.com/venmooffer for full terms. 1 per first-time Venmo transfer. Opt-in req. Min. $50 transfer from your Venmo account to your DraftKings DFS account. Max. $25 issued as DK Dollars that are non-withdrawable site credits and do not expire. Ends 4/30/26 at 11:59 PM ET or once 12,000 total transfer redemptions are reached, whichever is first. Terms: www.draftkings.com/venmooffer.

▶ Listen to the article now ⊕ ≡    ↻ (1.0x) ↺
Audio by Carbonatix

IMPORTANT LEGAL NOTICE REGARDING DRAFTKINGS 2026 MARCH MANIA SURVIVOR CONTEST

IMPORTANT! PLEASE CAREFULLY READ THESE OFFICIAL RULES ("Rules") BEFORE ENTERING THE DRAFTKINGS 2026 MARCH MANIA SURVIVOR CONTEST AS THESE RULES AFFECT YOUR LEGAL RIGHTS AND OBLIGATIONS.

A. **Rules and Eligibility**

B. The **DraftKings 2026 March Mania Survivor Contest** (the "Contest") is a survivor tournament commencing on March 6, 2026 exclusively for DraftKings Daily Fantasy Sports and DraftKings Sportsbook Customers who enter the Contest (each a "Contestant" and collectively, the "Contestants"). The Contest will be administered and scored according to these Rules.

C. By entering the Contest (as detailed in Section B, below) or participating in the Contest, you agree to be bound by, and subject to, (i) these Rules, (ii) the DraftKings Daily Fantasy Sports Terms of Use (available at: https://myaccount.draftkings.com/documents/us-terms-of-use in the event you access the Pools Lobby and enter the Contest via the DraftKings Daily Fantasy Sports website or mobile application, (iii) the DraftKings Sportsbook Terms of Use for the state you are physically located in when entering the Contest (available at: https://sportsbook.draftkings.com) in the event you access the Pools Lobby and enter the Contest via the DraftKings Sportsbook website or mobile application; and (iv) the DraftKings Privacy Notice (available at: https://myaccount.draftkings.com/documents/privacy-notice). You agree and understand that DraftKings may disclose certain information that you share with DraftKings, pursuant to the DraftKings Privacy Notice. In addition to other remedies provided in these Rules, the DraftKings Sportsbook Terms of Use, or in the DraftKings Daily Fantasy Sports Terms of Use, your failure to comply with these Rules, the DraftKings Sportsbook Terms of Use, or the DraftKings Daily Fantasy Sports Terms of Use may, among other things, result in disqualification from the Contest, removal from the Contest, and forfeiture of any Prize (as defined below) as determined by DraftKings in its sole and absolute discretion. Notwithstanding anything to the contrary set forth in these Rules, the DraftKings Sportsbook Terms of Use, or the DraftKings Daily Fantasy Sports Terms of Use, DraftKings has the right, in its sole and absolute discretion, for any reason or no reason, to disqualify or remove you from the Contest and to effectuate the forfeiture of your Prize or potential Prize.

D. BY ENTERING AND/OR PARTICIPATING IN THE CONTEST YOU UNDERSTAND AND AGREE THAT DRAFTKINGS INC. AND ITS AFFILIATES LIMIT THEIR LIABILITY IN CONNECTION WITH YOUR ENTRY INTO AND PARTICIPATION IN THE CONTEST AS SET FORTH IN THIS SECTION. UNDER NO CIRCUMSTANCES SHALL DRAFTKINGS INC., ITS PARENTS, SUBSIDIARIES, AFFILIATES, SUCCESSORS OR ASSIGNS, OR THE DIRECTORS, OFFICERS, EMPLOYEES, OR OTHER REPRESENTATIVES OF ANY OF THE FOREGOING (COLLECTIVELY, THE "COMPANY ENTITIES AND INDIVIDUALS"), BE LIABLE TO YOU FOR ANY LOSS OR DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, FOR ANY SPECIAL, DIRECT, INDIRECT, INCIDENTAL, EXEMPLARY, ECONOMIC, PUNITIVE, OR CONSEQUENTIAL DAMAGES) THAT ARE DIRECTLY OR INDIRECTLY RELATED TO: (1) THE CONTEST, THESE RULES, YOUR ENTRY INTO, OR PARTICIPATION IN THE CONTEST; (2) THE FANTASY SPORTS CONTESTS, CONTENT, PRODUCTS, SERVICES, AND PROMOTIONS ON DRAFTKINGS.COM AND/OR DRAFTKINGS MOBILE APPLICATION OR YOUR UPLOADED INFORMATION; (3) THE USE OF, INABILITY TO USE, OR PERFORMANCE OF DRAFTKINGS.COM AND/OR DRAFTKINGS MOBILE APPLICATION; (4) ANY ACTION TAKEN IN CONNECTION WITH AN INVESTIGATION BY THE COMPANY ENTITIES AND INDIVIDUALS OR LAW ENFORCEMENT AUTHORITIES REGARDING YOUR USE OF THE WEBSITE, THE DRAFTKINGS MOBILE APPLICATION, OR CONTENT; (5) ANY ACTION TAKEN IN CONNECTION WITH COPYRIGHT OWNERS; OR (6) ANY ERRORS OR OMISSIONS IN THE TECHNICAL OPERATION OF DRAFTKINGS.COM AND/OR THE DRAFTKINGS MOBILE APPLICATION, EVEN IN THE EVENT FORESEEABLE OR EVEN IN THE EVENT THE COMPANY ENTITIES AND INDIVIDUALS HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES WHETHER IN AN ACTION OF CONTRACT, NEGLIGENCE, STRICT LIABILITY, TORT (INCLUDING, WITHOUT LIMITATION, WHETHER CAUSED IN WHOLE OR IN PART BY NEGLIGENCE, ACTS OF GOD, TELECOMMUNICATIONS FAILURE, OR THEFT OR DESTRUCTION). IN NO EVENT WILL THE COMPANY ENTITIES AND INDIVIDUALS BE LIABLE TO YOU OR ANYONE ELSE FOR LOSS OR INJURY, INCLUDING, WITHOUT LIMITATION, DEATH OR PERSONAL INJURY. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU. IN NO EVENT SHALL THE COMPANY ENTITIES AND INDIVIDUALS' TOTAL LIABILITY TO YOU FOR ALL DAMAGES, LOSSES, OR CAUSES OF ACTION EXCEED ONE HUNDRED DOLLARS ($100). THE COMPANY ENTITIES AND INDIVIDUALS ARE NOT RESPONSIBLE FOR ANY DAMAGE TO ANY CONTESTANT'S COMPUTER, HARDWARE, COMPUTER SOFTWARE, OR OTHER EQUIPMENT OR TECHNOLOGY, INCLUDING, WITHOUT LIMITATION, DAMAGE FROM ANY SECURITY BREACH OR FROM ANY VIRUS, BUGS, TAMPERING, FRAUD, ERROR, OMISSION, INTERRUPTION, DEFECT, DELAY IN OPERATION OR TRANSMISSION, COMPUTER LINE OR NETWORK FAILURE, OR ANY OTHER TECHNICAL OR OTHER MALFUNCTION. YOUR PARTICIPATION IN THE CONTEST IS AT YOUR RISK. IN THE EVENT YOU ARE DISSATISFIED WITH THE CONTEST, YOUR SOLE

### Recently Published

NBA  March 17, 2026
**Giannis Antetokounmpo Headlines Today's NBA Injury Report: Tuesday 3/17/26**
DraftKings Network has you covered with the latest NBA injury report, news and top plays for Tuesday, 3/17/26.
By DK.Network.Editors

NBA  March 17, 2026
**Phoenix Suns vs. Minnesota Timberwolves prediction, pick for Tuesday 3/17/26**
Keagan Smith dives into his pick and prediction for the Phoenix Suns vs. Minnesota Timberwolves game on Tuesday's NBA slate.
By Keagan Smith

GOLF  March 17, 2026
**2026 Valspar Championship Picks: Golf Best Bets on DraftKings Sportsbook**
Alex Hunter provides his top golf bets on DraftKings Sportsbook for the 2026 Valspar Championship at the Copperhead Course.
By Alex Hunter

MLB  March 17, 2026
**World Baseball Classic Championship Parlays: USA vs. Venezuela Best Bets**
Best USA vs Venezuela parlays for the World Baseball Classic Championship. Player props, same game parlays, and betting picks on DraftKings.
By Steve Buchanan



57. DraftKings's unlawful use, advertising, marketing, promotion, offering, sale, and provision of gambling services associated with the Tournaments under and in connection with identical NCAA Basketball Marks and/or confusingly similar variations thereof is likely to cause, and continue to cause, confusion, deception, and mistake among the relevant public regarding whether there is an association between DraftKings and the NCAA, where no such association exists.

58. DraftKings uses the NCAA's exact NCAA Basketball Marks, which are identical in sight, sound, meaning, and commercial impression.

59. DraftKings further uses confusingly similar variations of the NCAA Basketball Marks, such as MARCH MANIA.

60. DraftKings's use of MARCH MANIA is confusingly similar to the NCAA's federally registered and famous MARCH MADNESS® mark, in sight, sound, meaning and commercial impression.

61. MARCH MANIA and MARCH MADNESS® share the identical first word, "March," the same pattern of alliteration, and the terms "mania" and "madness" are well recognized as synonyms, sharing the same meaning.

62. Further, DraftKings, on information and belief, adopted and began using MARCH MANIA deliberately to refer to and call to consumers' minds the NCAA's MARCH MADNESS® services and its Tournaments.

63. DraftKings's gambling services offered, sold, and provided under the identical NCAA Basketball Marks and confusingly similar variations thereof are related to the NCAA's basketball tournament services—indeed, without the NCAA's tournament services, DraftKings's gambling services branded under the NCAA Basketball Marks could not exist.

64. DraftKings's and the NCAA's services both focus on the Tournaments, target the same classes of consumers—ordinary members of the public, including college students and young adults—and are advertised and provided through the same channels of trade nationwide.

65. Further, the incorporation of the NCAA Basketball Marks and confusingly similar variations thereof into DraftKings's metatags and search engine optimization increases the likelihood that those searching for the NCAA Basketball Marks online will encounter advertisements for the NCAA's services alongside those of DraftKings.

66. DraftKings has no association, affiliation, sponsorship, or any other connection with the NCAA.

67. DraftKings has intentionally adopted and brazenly continued its use of the NCAA's NCAA Basketball Marks and confusingly similar variations thereof with full and complete knowledge of the NCAA's valuable, distinctive, and incontestable rights therein.

68. The NCAA has not consented to DraftKings's use of, and DraftKings is in no way authorized to use, the NCAA's famous and incontestable NCAA Basketball Marks.

69. DraftKings's extensive unauthorized and prominent misleading, deceptive, and confusing use of the NCAA Basketball Marks and/or confusingly similar variations thereof, improperly misleads, confuses, and deceives consumers into believing that DraftKings is somehow associated with or sponsored by the NCAA, when it is not.

70. It is not necessary for DraftKings to use the NCAA Basketball Marks or similar variations to identify the NCAA and its Tournaments.

71. Indeed, DraftKings, along with numerous other similarly situated betting sites and companies use descriptive alternatives to the NCAA Basketball Marks, such as the Division I

basketball tournaments, NCAA tournaments, or NCAA college basketball tournaments, to refer to the NCAA and its Tournaments.

72. Consumers have become accustomed to encountering non-infringing, descriptive alternatives when unlicensed parties, like DraftKings, refer to the Tournaments.

73. DraftKings's misuse is comprehensive; among other uses, the NCAA Basketball Marks and confusingly similar variations, including the NCAA's logos and unique letterings, are pervasively used as a navigation tab, a promotional label, a section header, and an advertising banner across its entire platform in the lead up to and during the Tournaments.

74. Such repetitive and widespread use is deliberately aimed at confusing consumers and cementing the false association with the NCAA.

75. Further, DraftKings's use of the famous and incontestable NCAA Basketball Marks in connection with its gambling services plainly harms the reputation of the Marks.

76. The U.S. District Court for the Eastern District of Virginia has previously found use of the NCAA's famous MARCH MADNESS® and NCAA® trademarks in connection with gambling services "tarnishes, and therefore dilutes the value of Plaintiff's distinctive and famous NCAA and MARCH MADNESS marks." *Natl. Collegiate Athletic Assn. v. BBF Intl.*, 2001 BL 1468, at *2 (E.D. Va. Mar. 16, 2001).

77. The U.S. Court of Appeals for the Fifth Circuit has previously upheld findings that MARCH MADNESS® is a valid and protectable mark and that marchmadness.com infringed upon that mark. *March Madness Athletic Assn. LLC v. Netfire Inc.*, 120 Fed. Appx. 540, 545 (5th Cir. 2005).

78. Consumers who encounter the NCAA Basketball Marks in a gambling context may come to associate the mark—and by extension the NCAA and its mission—with the gambling

industry, undermining the very message the NCAA has spent decades cultivating through its policies, its Draw the Line program, and its public advocacy.

79. Competition integrity is of the utmost importance to the NCAA.

80. An association with DraftKings's commercial gambling business is fundamentally incompatible with the NCAA's explicit, publicly articulated, and long-standing institutional values, and unlawfully links the NCAA's famous marks to an industry the NCAA has openly and forcefully rejected.

81. Every day that DraftKings is permitted to continue its unlawful use of the NCAA Basketball Marks and confusingly similar variations on its gambling platform undermines the NCAA's longstanding anti-gambling stances, erodes public trust, and inflicts continuing and irreparable harm on the NCAA's reputation and the goodwill symbolized by its famous marks.

82. Further DraftKings's unauthorized use of the NCAA Basketball Marks and confusingly similar variations has caused and is continuing to cause ongoing irreparable harm to the NCAA, the relevant public, and customers and potential customers who have been misled into believing there is an association between DraftKings and the NCAA.

83. The injuries and damages sustained by the NCAA have been directly and proximately caused by DraftKings's wrongful adoption and use of the NCAA's valuable and extremely well-known NCAA Basketball Marks, as well as DraftKings's intentional, willful, and wrongful advertisement, marketing, promotion, distribution, offer, sale, and provision of its gambling services in connection with its infringing use of the NCAA Basketball Marks, including to suggest a false association with the NCAA.

84. After the NCAA learned of DraftKings's ongoing, extensive, and unlawful use of its NCAA Basketball Marks, the NCAA formally notified DraftKings of the infringement and requested prompt removal of the offending materials.

85. Although DraftKings removed certain uses, it refused to fully comply and continues to assert a purported right to use the NCAA Basketball Marks in gambling-related commercial contexts.

86. Upon information and belief, DraftKings will continue to use, cause confusion, and wrongfully benefit and gain from its infringing use of the NCAA Basketball Marks and/or confusingly similar variations thereof, unless enjoined by this Court.

**COUNT I**
**TRADEMARK INFRINGEMENT**
**UNDER SECTION 32 OF THE LANHAM ACT (15 U.S.C. § 1114)**

87. The NCAA realleges and incorporates each and every allegation set forth in preceding paragraphs of the Complaint as if fully set forth and restated herein.

88. The NCAA is the owner of all right, title, and interest in, to, and under its distinctive NCAA Basketball Marks, as well as all goodwill therein.

89. The NCAA began using and acquiring rights in, to, and under, its valuable, extremely well-known, and famous NCAA Basketball Marks long prior to DraftKings's adoption and first use of the NCAA's NCAA Basketball Marks and/or confusingly similar variations thereof, including without limitation MARCH MANIA.

90. The NCAA is the senior user of its NCAA Basketball Marks for, at least, entertainment services related to its provision of the Tournaments, throughout the United States.

91. DraftKings's unlicensed, un-consented to, and otherwise unauthorized use of the NCAA's NCAA Basketball Marks and/or confusingly similar variations thereof, on or in

28

connection with its actual or intended advertising, marketing, promotion, offer, sale, and/or provision of its related gambling services, which also center, in pertinent part, on the Tournaments, has caused, will cause, and/or is likely to cause the trade, consumers, and the relevant purchasing public to be confused and mistaken as to the source or origin of the services being offered and sold by DraftKings and, further, to deceive the trade, customers, and the relevant purchasing public as to whether the NCAA is affiliated with, connected with, associated with, and/or a sponsor of DraftKings's use of the NCAA's distinctive, famous, and valuable NCAA Basketball Marks on or in connection with DraftKings's related services.

92. DraftKings initially and/or subsequently, acted willfully and intentionally in engaging in the activity described above, with the intent to confuse and deceive the public into believing that DraftKings and/or its gambling services related to the Tournaments originate from, are affiliated with, or are sanctioned, endorsed, approved, or authorized by the NCAA and/or its use of its NCAA Basketball Marks in connection with provision of the same Tournaments.

93. The knowing and intentional nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

94. By virtue of DraftKings's acts hereinabove described, DraftKings has committed and is continuing to commit acts of federal trademark infringement in violation of, *inter alia*, Section 32 of the Lanham Act, 15 U.S.C. § 1114.

95. DraftKings's aforesaid acts of trademark infringement have caused and will continue to cause damage and irreparable harm to the NCAA, and are likely to continue unabated, thereby causing further damage and irreparable harm to the NCAA and to the valuable goodwill symbolized by and associated with its distinctive and extremely well-known and famous NCAA Basketball Marks, unless enjoined and restrained by the Court.

96. The NCAA has no adequate remedy at law and has and will continue to suffer irreparable injury if DraftKings is allowed to continue to wrongfully use the NCAA Basketball Marks and/or any confusingly similar variations thereof.

**COUNT II**
**TRADEMARK FALSE ASSOCIATION AND UNFAIR COMPETITION**
**UNDER SECTION 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a))**

97. The NCAA realleges and incorporates each and every allegation set forth in the preceding paragraphs of the Complaint as if fully set forth and restated herein.

98. The NCAA is the owner of all right, title, and interest in, to, and under its distinctive NCAA Basketball Marks, as well as all goodwill therein.

99. The NCAA began using and acquiring rights in, to, and under, its valuable, extremely well-known, and famous NCAA Basketball Marks long prior to DraftKings's adoption and first use of the NCAA Basketball Marks and/or confusingly similar variations thereof.

100. The NCAA is the senior user of its NCAA Basketball Marks for entertainment services relating to annual basketball tournaments, namely, its Tournaments, throughout the United States.

101. DraftKings's unlicensed, un-consented to, and otherwise unauthorized use of the NCAA Basketball Marks and/or confusingly similar variations thereof, on or in connection with its advertising, marketing, promotion, offer, sale, and/or provision of its gambling services related to the Tournaments, has caused, will cause, and/or is likely to cause the trade, consumers, and the relevant purchasing public to be confused and mistaken as to whether there is an association between the NCAA and DraftKings, when there is no association, and, further, to deceive the trade, customers, and the relevant purchasing public as to whether the NCAA is affiliated with, connected

with, associated with, and/or a sponsor of DraftKings's use of the NCAA's distinctive, famous, and valuable NCAA Basketball Marks on or in connection with DraftKings's related services.

102. DraftKings initially and/or subsequently, acted willfully and intentionally in engaging in the activity described above with the intent to confuse and deceive the public into believing that DraftKings and/or its gambling services related to the Tournaments are associated with and/or endorsed by the NCAA.

103. The knowing and intentional nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

104. By virtue of DraftKings's acts hereinabove described, DraftKings has committed and is continuing to commit acts of federal trademark false association and unfair competition in violation of, *inter alia*, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

105. DraftKings's aforesaid acts of trademark false association and unfair competition have caused and will continue to cause damage and irreparable harm to the NCAA, and are likely to continue unabated, thereby causing further damage and irreparable harm to the NCAA and to the valuable goodwill symbolized by and associated with its distinctive and extremely well-known and famous NCAA Basketball Marks, unless enjoined and restrained by the Court.

106. The NCAA has no adequate remedy at law and has and will continue to suffer irreparable injury if DraftKings is allowed to continue to wrongfully use the NCAA Basketball Marks and/or any confusingly similar variations thereof.

## COUNT III
## FEDERAL TRADEMARK DILUTION
## <u>UNDER SECTION 43(c) OF THE LANHAM ACT (15 U.S.C. § 1125(c))</u>

107. The NCAA realleges and incorporates each and every allegation set forth in preceding paragraphs of the Complaint as if fully set forth and restated herein.

108. The NCAA is the owner of all right, title, and interest in, to, and under its distinctive NCAA Basketball Marks, as well as all goodwill therein.

109. The NCAA Basketball Marks are distinctive, widely recognized, and famous throughout the United States and in virtually all segments of the U.S. population, in that they are widely recognized by the general consuming public as a designation of source for the NCAA's high quality entertainment services, among others, related to its Tournaments.

110. DraftKings has used and is actually using trademarks on or in connection with its gambling services related to the Tournaments, which marks are identical to one or more of the NCAA Basketball Marks, after one or more of the NCAA Basketball Marks became famous, to wit, long prior to DraftKings's incorporation in, upon information and belief, 2012, let alone when DraftKings, upon information and belief, began its unauthorized use of the NCAA Basketball Marks more than a decade later.

111. Upon information and belief, DraftKings has acted and continues to act with knowledge of the fame and reputation of the NCAA Basketball Marks with the purpose of usurping such rights and to wilfully and intentionally confuse, mislead, and deceive members of the public.

112. DraftKings actions have and are likely to dilute and tarnish the NCAA Basketball Marks and harm the reputation of such Marks.

113. Preserving the integrity of athletic competition is a foundational principle of the NCAA and a central component of its mission and governance of collegiate sports.

114. When consumers encounter the NCAA Basketball Marks in connection with gambling services, they are likely to perceive an affiliation between the NCAA and the gambling industry, thereby distorting the NCAA's identity and undermining decades of deliberate efforts to promote policies, programs, and public messaging designed to separate collegiate athletics from commercial gambling.

115. DraftKings's continued unlawful use of the NCAA Basketball Marks during the ongoing Tournaments, a period of peak public attention, exacerbates the erosion of the NCAA's anti-gambling principles and public confidence, and it inflicts continuing and compounding damage to the NCAA's reputation and goodwill.

116. By virtue of DraftKings's acts hereinabove described, DraftKings has committed and is continuing to commit acts of trademark dilution by tarnishment in violation of, *inter alia*, 15 U.S.C. § 1125(c).

117. The aforesaid acts of trademark dilution have caused and will continue to cause damage and irreparable harm to the NCAA and are likely to continue unabated, causing further damage and irreparable harm to the NCAA and the goodwill symbolized by and associated with its NCAA Basketball Marks, unless enjoined and restrained by this Court.

118. The NCAA has no adequate remedy at law and will suffer irreparable injury if DraftKings is allowed to continue to wrongfully dilute and tarnish the reputation of the famous NCAA Basketball Marks.

119. Because DraftKings acted wilfully and intentionally to trade on the NCAA's reputation and cause dilution of their famous NCAA Basketball Marks, the NCAA is entitled to injunctive relief, damages, extraordinary damages, fees, and costs pursuant to 15 U.S.C. § 1125(c)(5).

## Prayer for Relief

**WHEREFORE**, Plaintiff the NCAA requests that the Court enter judgment against Defendant DraftKings, as follows:

a. An Order holding that DraftKings has violated the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and that such violations were willful and intentional, making this an "exceptional case" under 15 U.S.C. § 1117(a).

b. A preliminary and permanent injunction enjoining DraftKings, as well as its officers, shareholders, agents, servants, employees, attorneys, successors and assigns, affiliates, suppliers, manufacturers, distributors, business partners, e-tailers, retailers, and those in privity with DraftKings, as well as those persons in active concert or participation with any of them who receive actual notice of the judgment by personal service or otherwise, from: (i) using the NCAA Basketball Marks and/or any confusingly similar variations thereof, including without limitation MARCH MANIA, in any manner or form, or any other reproduction, counterfeit, copy, or colorable imitation of such mark, either alone or in combination with any other designation, on or in connection with any manufacturing, marketing, advertising, promoting, distributing, offering for sale, providing, or selling of DraftKings's goods and services, including without limitation, gambling services; (ii) taking or failing to take any action, as appropriate, that is likely to induce the belief that DraftKings and/or its products or services are in any way associated with or sponsored by the NCAA and/or that unfairly competes with the NCAA; and (iii) taking any action that otherwise infringes and/or dilutes and/or tarnishes the reputation of the NCAA Basketball Marks;

c. An Order directing DraftKings to file with this Court and serve on the NCAA's counsel within 30 calendar days after service of an injunction, a report under oath setting forth in detail the manner and form in which DraftKings has complied with the injunction;

d.      An Order directing DraftKings to (i) immediately recall and destroy and/or obliterate, in accordance with written instructions from the NCAA, any and all point-of-sale and/or consumer facing materials, labels, signage, boxes, prints, catalogues, branding style guides, line sheets, marketing materials, internet webpages, metatags, search engine optimizations, paid search ads, sponsored ads, packages, papers, press release(s), telephone directories or listings, answering of telephones, business cards, email signature blocks, other trade dress, and any other materials in the possession or control of DraftKings, upon which appears or otherwise reflects the NCAA Basketball Marks, and/or any confusingly similar variations thereof, including without limitation MARCH MANIA, in any manner or form, or any other reproduction, counterfeit, copy, or colorable imitation of the NCAA Basketball Marks, either alone or in combination with any designation;

e.      An Order directing DraftKings to provide an accounting for all DraftKings's profits (if any) arising from the complained-of-acts, in accordance with 15 U.S.C. § 1117;

f.      An Order awarding the NCAA the damages it actually sustained, including, *inter alia*: (i) as a consequence of DraftKings's infringement of and upon the NCAA Basketball Marks; (ii) as a consequence of DraftKings's use of the NCAA Basketball Marks and confusingly similar variations thereof to suggest a false association and compete unfairly with the NCAA; and (iii) as a consequence of DraftKings's dilution and tarnishment of the NCAA Basketball Marks;

g.      An Order awarding the NCAA the greater of treble the damages the NCAA has suffered as a result of the complained-of-acts or treble DraftKings's profits, pursuant to 15 U.S.C. § 1117.

h. An Order awarding the NCAA its reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117, as well as costs and pre-judgment and post-judgment interest on the above damage awards; and

i. An Order awarding such other and further relief that this Court may deem just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), the NCAA hereby respectfully demands a trial by jury of all issues so triable by a jury.

Dated: March 20, 2026

By: /s/ Ryan M. Hurley

Ryan M. Hurley (#24956-49)
FAEGRE DRINKER BIDDLE & REATH LLP
300 North Meridian Street, Suite 2500
Indianapolis, Indiana 46204
T: (317) 237-0300
F: (317) 237-1000
ryan.hurley@faegredrinker.com

K. Lee Marshall*
Matthew G. Minder*
Nicole Wurm*
Michael E. Rowan*
BRYAN CAVE LEIGHTON PAISNER LLP
211 North Broadway, Suite 3600
St. Louis, Missouri 63102
Tel: (314) 259-2000
Fax: (314) 259-2020
Lee.Marshall@bclplaw.com
Matt.Minder@bclplaw.com
Nicole.Wurm@bclplaw.com
Michael.Rowan@bclplaw.com

*Attorneys for Plaintiff National Collegiate
Athletic Association*

*pro hac vice forthcoming*