**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an Indiana Unincorporated Association | ) ) ) | |
| | ) | Case No. 1:26-cv-00557-TWP-MG |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S MEMORANDUM** |
| v. | ) | **OF LAW IN OPPOSITION TO** |
| | ) | **PLAINTIFF'S MOTION FOR A** |
| DRAFTKINGS, INC., a Nevada Corporation | ) | **TEMPORARY RESTRAINING** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT..................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

      A.     DraftKings' Open, Public, and Longstanding Conduct. ........................................ 3

      B.     The Parties' Years-Long Course of Conduct............................................................ 6

      C.     Longstanding Industry Use. ................................................................................. 8

      D.     The NCAA Directly Facilitates Sports Betting....................................................... 10

      E.     DraftKings' Industry-Leading Responsible Gaming Program ............................. 11

ARGUMENT ............................................................................................................ 12

I.        The NCAA's Years-long Delay Is Fatal to Its Claim of Irreparable Injury............ 12

II.      The NCAA Cannot Show a Likelihood of Success on Its Trademark Claims...... 15

      A.     The NCAA's Claims Are Barred by Laches. ......................................................... 15

      B.     DraftKings' Use of the NCAA Basketball Marks Does Not Infringe the
            NCAA's Trademark Rights. ..................................................................................... 16

            1.     Consumers Are Not Likely to Be Confused by DraftKings' Use of
                  Commonly Understood Tournament Terminology. ................................. 17

            2.     DraftKings' Use of the NCAA Basketball Marks on DraftKings Network
                  Is Not Trademark Infringement. .............................................................. 24

      C.     The NCAA's Dilution Claim Is Barred by the Lanham Act's Nominative
            Fair Use Exception.................................................................................................. 25

III.     The Balance of Equities Overwhelmingly Favors DraftKings. ............................ 27

IV.     The Public Interest Weighs Against A TRO.......................................................... 30

CONCLUSION........................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*3M Co. v. Christian Investments LLC*,
2012 WL 6561732 (E.D. Va. July 12, 2012)............................................................27

*Allied Interstate LLC v. Kimmel & Silverman P.C.*,
2013 WL 4245987 (S.D.N.Y. Aug. 12, 2013)..........................................................26

*AM Gen. Corp. v. DaimlerChrysler Corp.*,
311 F.3d 796 (7th Cir. 2002) ...................................................................................28

*Applied Underwriters, Inc. v. Lichtenegger*,
913 F.3d 884 (9th Cir. 2019) ...................................................................................26

*Benisek v. Lamone*,
585 U.S. 155 (2018)..................................................................................................28

*In re C2R Glob. Mfg., Inc.*,
2020 WL 5941330 (Bankr. E.D. Wis. Oct. 6, 2020) ...............................................14

*CAE, Inc. v. Clean Air Eng'g, Inc.*,
267 F.3d 660 (7th Cir. 2001) ...................................................................................19

*Caterpillar Inc. v. Walt Disney Co.*,
287 F. Supp. 2d 913 (C.D. Ill. 2003) .......................................................................29

*CBS Interactive Inc. v. NFL Players Ass'n*,
259 F.R.D. 398 (D. Minn. 2009)..............................................................................25

*Chanel, Inc. v. The RealReal, Inc.*,
449 F. Supp. 3d 422 (S.D.N.Y. 2020).......................................................................19

*Chattanooga Mfg., Inc. v. Nike, Inc.*,
301 F.3d 789 (7th Cir. 2002) ...................................................................................16

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985)......................................................................................13

*Daniels v. FanDuel, Inc. & DraftKings, Inc.*,
109 N.E.3d 390 (Ind. 2018) .....................................................................................24

*Daniels v. FanDuel Inc. & DraftKings, Inc.*,
No. 1:16-cv-01230-TWP, 2017 WL 4340329 (S.D. Ind. Sept. 29, 2017)..............24

*Door Sys., Inc. v. Overhead Door Sys., Inc.*,
905 F. Supp. 492 (N.D. Ill. 1995) ............................................................................20

*Dwyer Instruments, Inc. v. Sensocon, Inc.*,
873 F. Supp. 2d 1015 (N.D. Ind. 2012) .............................................................17, 19

*Eastland Music Grp., LLC v. Lionsgate Ent., Inc.*,
  707 F.3d 869 (7th Cir. 2013) ...................................................................................22

*EMI v. Smith*,
  279 F.3d 1135 (9th Cir. 2002) ..................................................................................21

*Forest River, Inc. v. inTech Trailers, Inc.*,
  699 F. Supp. 3d 712 (N.D. Ind. 2023) .................................................................18, 19

*Gema USA, Inc. v. First in Finishing Inc.*,
  No. 1:22-cv-02053-TWP, 2025 WL 3073875 (S.D. Ind. Mar. 27, 2025)
  ...........................................................................................3, 16, 17, 18, 19, 20, 21

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
  13 F. Supp. 2d 417 (S.D.N.Y. 1998)..........................................................................15

*Goodman v. Illinois Dep't of Fin. & Pro. Regul.*,
  430 F.3d 432 (7th Cir. 2005) ....................................................................................12

*Hugunin v. Land O' Lakes, Inc.*,
  815 F.3d 1064 (7th Cir. 2016) ...................................................................................27

*Illinois Tamale Co., Inc. v. LC Trademarks, Inc.*,
  164 F.4th 648 (7th Cir. 2026) ....................................................................................13

*In Motion Orthopaedics West, Inc. v. Cmiel*,
  No. 1:26-cv-00296-TWP-MJD, 2026 WL 560937 (S.D. Ind. Feb. 27, 2026).....................2, 14

*Kastanis v. Eggstacy LLC*,
  752 F. Supp. 2d 842 (N.D. Ill. 2010) .........................................................................30

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
  543 U.S. 111 (2004).................................................................................................17

*Mattel, Inc. v. MCA Records, Inc.*,
  296 F.3d 894, 900 (9th Cir. 2002) .............................................................................25

*MB Fin. Bank, N.A. v. MB Real Est. Servs., L.L.C.*,
  2003 WL 21462501 (N.D. Ill. June 23, 2003).............................................................18

*Metavante Corp. v. Medavant, Inc.*,
  2006 WL 1277903 (E.D. Wis. May 5, 2006)................................................................20

*Michael Caruso and Co., Inc. v. Estefan Enter. Inc.*,
  994 F. Supp. 1454 (S.D. Fla. 1998) ...........................................................................14

*NCAA v. BBF Int'l*,
  2001 BL 1468 (E.D. Va. Mar. 16, 2001) .....................................................................27

*Nike, Inc. v. Just Did It Enters.*,
  6 F.3d 1225 (7th Cir. 1993) ......................................................................................18

*Packman v. Chi. Trib. Co.*,
  267 F.3d 628 (7th Cir. 2001) ..........................................................................18, 24, 25

*Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*,
    80 F. Supp. 2d 815 (N.D. Ill. 1999) ..................................................................................20

*Playboy Enters., Inc. v. Welles*,
    279 F.3d 796 (9th Cir. 2002) ..............................................................................................26

*Radiance Foundation, Inc. v. N.A.A.C.P.*,
    786 F.3d 316 (4th Cir. 2015) .........................................................................................24, 26

*Redbox Automated Retail, LLC v. Xpress Retail LLC*,
    310 F. Supp. 3d 949 (N.D. Ill. 2018) ..................................................................................13

*Rust Env't & Infrastructure, Inc. v. Teunissen*,
    131 F.3d 1210 (7th Cir. 1997) ............................................................................................20

*S Indus., Inc. v. GMI Holdings, Inc.*,
    1998 WL 67627 (N.D. Ill. Jan. 30, 1998) ..........................................................................19

*Scott Fetzer Co. v. House of Vacuums, Inc.*,
    381 F.3d 477 (5th Cir. 2004) ..............................................................................................25

*SouthernCare, Inc. v. Bristol Hospice - Indiana, LLC*,
    No. 4:25-cv-00150-TWP, 2025 WL 3725592 (S.D. Ind. Aug. 20, 2025) .........................12, 15

*SportFuel, Inc. v. PepsiCo, Inc.*,
    932 F.3d 589 (7th Cir. 2019) ..............................................................................................19

*Top Tobacco, L.P. v. N. Atlantic Operating Co., Inc.*,
    2007 WL 118527 (N.D. Ill. Jan. 4, 2007)...........................................................................21

*Tourmaline Management LLC v. Tourmaline Capital Partners, LLC*,
    2025 WL 2338069 (D. Del. Aug. 13, 2025) .......................................................................14

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
    610 F.3d 1171 (9th Cir. 2010) ............................................................................................30

*TWD, LLC v. Grunt Style LLC*,
    2023 WL 7095011 (N.D. Ill. Mar. 23, 2023).....................................................................13

*Vienna Beef, Ltd. v. Red Hot Chicago, Inc.*,
    833 F. Supp. 2d 870 (N.D. Ill. 2011) .............................................................................29, 30

*Youngblood v. Wilson*,
    2008 WL 215739 (N.D. Ind. Jan. 24, 2008) ......................................................................27

**STATUTES**

15 U.S.C. § 1125(c)(3)(A) ..........................................................................................................26

**OTHER AUTHORITIES**

Austin Mock, *Best strategies to help you win your 2026 March Madness pool*,
    THE NEW YORK TIMES (Mar. 16, 2026)..........................................................................10

Defendant DraftKings Inc. ("DraftKings") respectfully submits this memorandum in opposition to the Motion for a Temporary Restraining Order (ECF 3) and Memorandum of Law (ECF 15, or "Brief") filed by Plaintiff National Collegiate Athletic Association (the "NCAA").

## PRELIMINARY STATEMENT

Since 2021, DraftKings has used the words "March Madness," "Sweet 16," "Elite 8," and "Final 4"—the universally recognized names for the tournaments and their rounds, used by millions of college basketball fans, journalists, and participants in the sports-betting ecosystem. They are the same words used by other online sportsbooks, who have not been singled out by the NCAA's fevered complaint. The NCAA knew or should have known about DraftKings' public, open, and consistent usage for more than five years, yet never sued to halt what it now characterizes as irreparable harm to its purported "firm separation from commercial gambling." *See* Compl. ¶ 5.

The NCAA fails to disclose these material facts, and others, yet asks this Court to impose the extraordinary remedy of a TRO based on a contrived and manufactured "emergency." In doing so, it has disregarded its fundamental duty of candor, presenting a distorted narrative designed to malign and tarnish DraftKings. Its version of events is incomplete and cannot be credited.

The timing of this lawsuit underscores its lack of legitimacy. In the middle of March Madness, the NCAA rushed to court last Friday night, professing itself "*shocked—shocked to find that gambling is going on in here!*" Like Captain Renault in *Casablanca*, the NCAA feigns surprise at conduct it has long known about and tacitly accepted. And, like Captain Renault, the NCAA profits from the very betting activity it now claims is intolerable.

The NCAA also fails to disclose that it entered into a multi-year commercial agreement with Genius Sports a/k/a Betgenius ("Genius")—a company whose core business is providing in-game data to sportsbooks—structured to generate substantial revenue from sports betting. A party that has chosen to enter a long-term partnership with the sports-betting industry cannot plausibly

1

claim reputational injury from being associated with it. The NCAA's theory of irreparable harm is not merely weak—it is affirmatively contradicted by its own business conduct.

The NCAA's TRO submission is thus a study in omission. It omits any acknowledgment that DraftKings' longstanding challenged "use" of the terms at issue is not to identify the source of DraftKings' services, but to allow DraftKings' users to follow NCAA games and participate in the same interactive features as they do for other professional and amateur sporting events. Worse, it offers no explanation for its years of inaction. And it fails to disclose that the NCAA itself encourages and benefits directly from betting activity tied to March Madness. The NCAA provides no justification for its calculated delay followed by opportunistic litigation timed to coincide with the peak of the tournament.

That unexplained delay alone defeats any claim to emergency relief. A party that knowingly permits the challenged conduct for years cannot credibly assert that immediate judicial intervention is necessary to prevent irreparable harm. *See, e.g.*, *In Motion Orthopaedics W., Inc. v. Cmiel*, No. 1:26-cv-00296-TWP-MJD, 2026 WL 560937, at *3 (S.D. Ind. Feb. 27, 2026) (denying TRO extension where plaintiff delayed and failed to show irreparable harm).

The more fundamental reason for the NCAA's prolonged inaction is evident: it lacks a viable trademark claim. "March Madness," "Sweet 16," "Elite 8," and "Final 4" are not the NCAA's private property—they are embedded in our cultural lexicon, used in the same way by broadcasters, journalists, fans, and businesses to refer to a sporting phenomenon and a shared national moment. The Lanham Act does not permit a trademark holder to appropriate common referential or identifying language and silence all others from using it in its ordinary sense. Nor does it permit a party to sleep on its rights for years and then seek emergency relief at the eleventh hour. The NCAA will not succeed on the merits: its claims are barred by laches. And this case

2

involves precisely the type of referential use courts recognize as lawful and beneficial to consumers.

The NCAA's claims fail on the facts, the law, and common sense. It faces no cognizable harm absent a TRO. By contrast, the NCAA is trying to harm DraftKings' reputation through unfounded insinuation. The record should be clear: DraftKings respects intellectual property rights. DraftKings is a legal and licensed sportsbook that paid millions of dollars in taxes last year to the Hoosier State. And DraftKings has invested heavily in building industry-leading responsible gaming tools and resources to support responsible engagement and informed decision making. DraftKings does not design marketing to appeal to individuals under the legal betting age, does not use content intended to attract underage audiences, does not partner with colleges or universities to promote betting, does not enter name, image, or likeness agreements with amateur athletes and does not advertise on college campuses or through university owned media. DraftKings also employs rigorous onboarding safeguards, including Know Your Customer protocols requiring user identification and third-party age and identity verification. Users who cannot be verified as eligible are not permitted to bet—full stop.

This is not an emergency, but a calculated gambit brought after years-long delay and built on conspicuous omissions, including the NCAA's own significant partnership with the sports-betting industry. Having tolerated and benefited from the very conduct it now decries, the NCAA comes to this Court with a selective narrative, no irreparable harm or likelihood of success on the merits, and unclean hands. Equity does not reward such litigation tactics. The NCAA's request for a TRO should be denied.

## STATEMENT OF FACTS

### A.    DraftKings' Open, Public, and Longstanding Conduct.

DraftKings operates a digital sports entertainment platform that provides users with access to sports-related information, content, and interactive features, including the ability to follow

sporting events, access statistics and analysis, engage with editorial content, and, where permitted by law, place bets on those events.  DraftKings' Sportsbook is available through its website (www.draftkings.com) and its Sportsbook mobile app.  DraftKings also operates a website called DraftKings Network (dknetwork.draftkings.com), where it publishes news articles and analyses concerning sports, fantasy sports, and sports betting.  Declaration of Tom Butterworth ("Butterworth Decl.") ¶¶ 3–5.

Identifying and referencing particular events, tournaments, teams, and leagues in a manner consistent with how those events are commonly understood by the public is a standard feature of sports media and sportsbook platforms and is integral to how users navigate and interact with sports content.  DraftKings is no exception:  for years, DraftKings has openly, publicly, and consistently made nominative use of the terms "March Madness," "March Mania," "Sweet 16," "Elite 8," and "Final 4" when providing editorial content and identifying events on which consumers may lawfully place bets.  *Id*. ¶¶ 7–18.

Within its app and on its Sportsbook website, DraftKings has used the terms "March Madness" and related terminology for years in a purely referential manner, to ensure its customers understand what events are being discussed, and to ensure they place bets on the correct events. *Id.* ¶¶ 19–21.  Those references do not suggest any affiliation with or sponsorship by the NCAA, but instead differentiate March Madness betting opportunities from multiple other sporting events—including college basketball tournaments that occur at the same time every year.  This year alone, for example, the NCAA operates not only the men's and women's March Madness tournaments, but also the Division I men's National Invitation Tournament, Division II men's and women's championship tournaments, and Division III men's and women's championship tournaments.  *Id.* ¶ 19.  Other college basketball tournaments that take place at the same time

include the College Basketball Crown and Women's National Invitation Tournament.

DraftKings has openly and publicly referenced "March Madness" and "Final Four" in its Sportsbook offerings *since at least 2021* in precisely the same way as other sports information and betting sources:



*Id.* ¶ 7  (DraftKings screenshot with information on 2021 NCAA tournament).

The DraftKings Sportsbook platforms have displayed the words "March Madness" during the tournament since at least 2023.  *Id.* ¶ 8.  Likewise, for years DraftKings has referenced "Sweet 16," "Elite 8," and "Final 4" to identify betting events.  *Id.* ¶ 11.  These words appear in the same format (font style and size) and context as references to other sports, leagues, and events.  *Id.* ¶ 8. For this year's tournament, DraftKings launched futures bets on the "Final 4" as early as September 1, 2025.  *Id.* ¶ 12.



Since at least 2019, DraftKings has consistently used the phrase "March Mania" on social media, television, emails, and push notifications. *Id.* ¶ 15.

DraftKings also publishes on its DraftKings Network website news articles and analyses concerning March Madness. References to "March Madness" have appeared in various DraftKings Network news articles since at least 2021. *See* Decl. *id.* Ex. 1–4.



### B.    The Parties' Years-Long Course of Conduct.

The NCAA has known about DraftKings' use of "March Mania," since at least 2015 and knew or should have known about its use of "March Madness," and related terminology since at

least 2021.[1]  In 2015, the NCAA complained to DraftKings about its use of "March Mania." Butterworth Decl. Ex. 5.  DraftKings initially removed that phrase from its platforms but did not agree that the phrase infringed any of the NCAA's trademarks or to cease using it in the future.

DraftKings resumed using "March Mania" in 2019.  *Id.* ¶ 15.  The NCAA, however, waited until March 2021 to respond, sending two more letters again complaining about DraftKings' use of "March Mania" on its platforms.  *Id*. ¶ Exs. 7, 8.  DraftKings responded in writing, explained that it had resumed use of the phrase more than a year earlier, set forth in detail why that use was lawful, explained that DraftKings would be disadvantaged if others were able to use that phrase, and invited a further discussion if necessary.  *Id.* Ex. 9, 10.  The NCAA did nothing.

Four years later, in May 2025, DraftKings again responded to correspondence from the NCAA regarding "March Mania."  *Id.* Ex. 11.  DraftKings reiterated that it had used the phrase for years, the NCAA had no enforceable rights in that phrase, and there was no evidence of any enforcement effort against anyone in the marketplace.  *Id.*  Again, the NCAA did nothing.

In March 2026—more than *a decade* after the parties first corresponded about trademark issues, more than *seven years* after DraftKings resumed using "March Mania," more than *five years* after DraftKings starting referencing "March Madness," "Sweet 16," "Elite 8," and "Final 4," and more than *seven months* after DraftKings began offering betting opportunities for this year's March Madness tournaments—the NCAA now claims an emergency.  On March 3, for the first time in all those years, the NCAA raised concerns about three DraftKings' uses of "March Madness" in search engine optimization on its website.  *Id.* ¶ 35.  The NCAA requested that

---

[1] The NCAA's sworn declaration proclaims that it "monitors the marketplace for possible unauthorized usage of its trademarks through a combination of tools, including commercial monitoring services, periodic monitoring and reporting from in-house and outside counsel, and reporting from NCAA staff, community members, and corporate partners" and that it "aggressively" protects "March Madness" and "Final Four."  ECF 17 ("Miles Decl.") ¶¶ 20–21.

DraftKings instead use either "D1 Men's College Basketball Tournament" or "College Basketball Tournament" on its platforms and requested a response by March 10. *Id.*

DraftKings responded on March 10, explaining that it had voluntarily removed the specific references to "March Madness" on its platform complained of in the NCAA's letter, even though DraftKings used the phrase simply to identify the relevant event for users. *Id.* ¶ 36. DraftKings also explained that the NCAA's proposed alternative terminology would not clearly distinguish among the multiple Division I basketball tournaments occurring at the same time. *Id.*

The NCAA did not respond until March 17, when it identified additional references and demanded removal by 5:00 p.m. ET the next day, March 18. *Id.* ¶ 37. On March 18, the NCAA sent a follow-up communication reiterating its demands and identifying additional third-party content. *Id.* Neither of the NCAA's letters responded to DraftKings' explanation that it uses the words "March Madness" and related phrases in a referential manner and needs to do so to allow customers to distinguish between the different Division I college basketball tournaments.

On March 18, 2026, DraftKings responded again. *Id.* ¶ 38. DraftKings explained that certain identified uses were outside of its control, including third-party content and organic search engine results, and that DraftKings nonetheless took steps to request removal by third parties where possible. *Id.* DraftKings also reiterated its position that the use of commonly understood terminology like "March Madness" is necessary to identify the relevant tournament to users. *Id.*

### C.    Longstanding Industry Use.

References to March Madness and related terminology are ubiquitous in the press and among other online sportsbooks. The NCAA's own declarations identify more than 10,000 references to March Madness in major US newspapers since 2016 alone. Wurm Decl. ¶ 34. For years, and as of the filing of this complaint, nearly every major competitor—including bet365, BetMGM, FanDuel, and Fanatics—was using the same terminology in the same manner. *See, e.g.,*

8

Declaration of Daniel Murphy ("Murphy Decl.") Exs. 1–4. These companies use these referential terms across various consumer-facing channels, including their sportsbook interfaces, promotional materials, and long-form editorial content. *Id.* Like DraftKings, those companies use universally understood terms to identify betting opportunities on their platforms. Yet the NCAA sued only DraftKings.

Within sportsbook apps, references to these terms—or even the NCAA logo—are currently live on, for example, FanDuel, Fanatics, and bet365:





*Id.* Ex. 1 at 2, *FanDuel*          *Id.* Ex. 1 at 4, *Fanatics*          *Id.* Ex. 1 at 5, *bet365*[2]

These references appear in real time to consumers and are used in the same referential manner as DraftKings uses them—to identify the relevant tournament and its stages. DraftKings' competitors, like DraftKings, have used these references for years. *Id.* Ex. 1; Butterworth Decl. ¶ 25–26.

---

[2] bet365 even uses the NCAA's logo within its sportsbook app.

The same terminology is also widely used in editorial content, news articles, and analyses. Operators such as FanDuel, BetMGM, Caesars, bet365, and Fanatics publish articles and betting analyses that repeatedly reference "March Madness," "Final Four," "Sweet 16," and "Elite 8" in headlines and body text to refer to tournament developments, odds, and predictions. *See, e.g.*, Murphy Decl. Ex. 2. These editorial uses are identical to those on DraftKings Network that the NCAA now challenges. *Compare id. with, e.g.*, Compl. 15–23.

### D.    The NCAA Directly Facilitates Sports Betting.

Contrary to the NCAA's claim that it "expressly prohibit[s] any commercial association of its trademarks" with gambling, Br. 5, the NCAA's March Madness tournament may be the gambling event that more Americans participate in than any other. *See, e.g.*, Declaration of Jacob Spencer ("Spencer Decl.") Ex. 13, Austin Mock, *Best strategies to help you win your 2026 March Madness pool*, THE NEW YORK TIMES (Mar. 16, 2026) ("It doesn't matter if you're a huge college basketball fan, a sports fan or you haven't watched a single basketball game this season. Most of us will fill out a bracket for an office pool."). In fact, the NCAA directly facilitates online betting markets and permits the use of its marks by sportsbooks through its partnership with Genius. Since 2018, the NCAA has partnered with Genius to collect and distribute NCAA data, including through its official LiveStats system. *See* Spencer Decl. Ex. 2. In announcing that agreement, the NCAA stated that Genius would serve as its exclusive agent to license real-time official data from NCAA championship events, including March Madness, to media platforms and other companies. *Id.*

The NCAA and Genius expanded their relationship in April 2025. Spencer Decl. Ex. 4. According to Genius' own press release, it is "the exclusive distributor of official NCAA data to licensed sportsbooks for all post-season tournaments, including March Madness" and "ensures the delivery of fast, accurate, and secure data to the regulated sports betting market." *Id.* at 2. As part of the agreement, Genius offers licensed sportsbooks "exclusive access to official NCAA data

10

feeds *alongside NCAA marks and logos*." *Id.* (emphasis added).  Indeed, Genius' press release

prominently displays Genius' logo alongside the NCAA's:



The April 2025 Genius deal was widely reported on by the press, with Reuters, for example,

commenting that, "[w]hile the NCAA has tried to keep its distance from the growing sports betting

industry, the partnership with Genius Sports puts it more in line with professional sports leagues

that have working relationships with the industry."  Spencer Decl. Ex. 6 at 2.  The NCAA is thus

not removed at all from the regulated sports-betting arena—by choosing to distribute NCAA data

into that ecosystem through its official data partner, it participates in the very activity it now claims

to avoid.

### E.      DraftKings' Industry-Leading Responsible Gaming Program

Online sports betting is lawful in and extensively regulated by Indiana.  DraftKings offers

its Sportsbook platforms only where licensed and subject to state regulatory oversight.  Within that

legal framework, DraftKings has invested heavily into its industry-leading responsible gaming

program.  DraftKings engages in user verification.  Butterworth Decl. ¶ 47.  It requires users to

provide identifying information and uses third-party verification systems to confirm the user's asserted identity and age. *Id.* If DraftKings cannot verify a user's eligibility, that user is not permitted to bet. *Id.* In addition, DraftKings provides a suite of responsible gaming tools and resources, including allowing users to set personal limits on time and spending on the platform, as well as enabling users to self-exclude from access to DraftKings altogether. *Id.* ¶ 52. And it supports the Responsible Online Gaming Association's nationwide educational initiative for college-aged individuals regarding responsible gaming, financial literacy, and risk awareness. *Id.* ¶ 54.

DraftKings has also adopted significant controls to ensure the integrity of sports betting. Among other things, DraftKings places limits on certain types of bets in college sports. *Id.* ¶ 50. And DraftKings monitors risk signals in real time, collaborating with sports leagues and governing bodies to detect, investigate, and prevent integrity issues, including by flagging suspicious betting activity. *Id.* ¶¶ 48–51.

## ARGUMENT

### I.      The NCAA's Years-long Delay Is Fatal to Its Claim of Irreparable Injury.

The TRO should be denied because the NCAA cannot make a "clear showing" that "it will suffer irreparable harm" if relief is not granted. *Goodman v. Illinois Dep't of Fin. & Pro. Regul.*, 430 F.3d 432, 437 (7th Cir. 2005); *see also SouthernCare, Inc. v. Bristol Hospice - Indiana, LLC*, No. 4:25-cv-00150-TWP, 2025 WL 3725592, at *4 (S.D. Ind. Aug. 20, 2025). The NCAA waited *more than five years* before filing this suit and requesting a TRO halfway through this year's tournaments. DraftKings has openly and publicly used "March Mania" since 2019, and has used "March Madness," "Sweet 16," "Elite 8," and "Final 4" to identify NCAA tournament events since 2021. Butterworth Decl. ¶¶ 7, 11. The parties have corresponded for *years* about trademark issues, yet the NCAA never once complained about anything other than "March Mania" until a few weeks

12

ago.  The NCAA sat on its hands through tournament after tournament, year after year, while the very supposed harm it now calls an emergency played out in plain sight.  As for this tournament, the NCAA waited more than *nine months* after DraftKings launched futures bets on the "Final 4" before it bothered to file suit—then had the audacity to seek emergency relief in the middle of March Madness without so much as acknowledging its delay, let alone justifying it.  *See id.* ¶ 12.  Courts do not reward that kind of litigation gamesmanship, and this Court should not be the first.

"Standing alone," the NCAA's "lengthy, unexplained delay in seeking relief" is sufficient to "preclude[] a finding of irreparable harm."  *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018).  The delay alone demonstrates the NCAA lacks any "urgent" need for equitable relief.  *Id*.  And the NCAA cannot now "manufacture a sense of urgency that is not supported by [its] own conduct."  *Id.*

Lacking any basis in fact, the NCAA seeks refuge in a "rebuttable presumption of irreparable harm."  Br. 27 (quoting *Illinois Tamale Co., Inc. v. LC Trademarks, Inc*., 164 F.4th 648, 654 (7th Cir. 2026)).  But that presumption does not apply because the NCAA is unlikely to succeed on the merits.  *See infra*, § II.  And even if it applied, "that presumption can be negated by delay in seeking a preliminary injunction."  *TWD, LLC v. Grunt Style LLC*, 2023 WL 7095011, at *4 (N.D. Ill. Mar. 23, 2023).  Courts routinely hold that "[s]ignificant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial."  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  Even a few months of dithering defeats irreparable harm.  *See Redbox,* 310 F. Supp. 3d at 953 (collecting cases).  The "longest such delay *ever permitted by the Seventh Circuit* appears to be nine months."  *Id.* (emphasis added).  The NCAA's years-long delay, for which it offers "no excuse," explanation, or even acknowledgement, *TWD, LLC*, 2023 WL 7095011, at *4, is "far

13

longer than prudence can bear," *In re C2R Glob. Mfg., Inc.*, 2020 WL 5941330, at *21 (Bankr. E.D. Wis. Oct. 6, 2020) (denying irreparable harm for five-year delay). And far too long to justify a TRO. *See In Motion Orthopaedics West, Inc.*, 2026 WL 560937, at *3.

"Similarly telling is the fact that" the NCAA has stood idly by while countless third parties—including DraftKings' direct competitors—have used "March Mania," "March Madness," "Sweet 16," "Elite 8," and "Final 4" to identify NCAA tournament events. *Tourmaline Management LLC v. Tourmaline Capital Partners, LLC*, 2025 WL 2338069, at *3 (D. Del. Aug. 13, 2025); *see generally* Murphy Decl. As of the filing of the complaint, nearly every major competitor—bet365, BetMGM, Caesars, FanDuel, and Fanatics—was using the same terminology in the same manner. *Id.* Yet the NCAA did not sue them, much less seek emergency relief against them. "That is another measure of delay," as it indicates the NCAA has "idly watched" as others used the terms. *Id.* It further "suggest[s] that [plaintiff] does not feel especially threatened." *Id.* This "extensive third-party use … seriously undermin[es] Plaintiff's contention that irreparable harm will occur if [DraftKings'] use continues." *Michael Caruso and Co., Inc. v. Estefan Enter. Inc.*, 994 F. Supp. 1454, 1464–65 (S.D. Fla. 1998).

The NCAA tells the Court that "one of the NCAA's most deeply held institutional values [is] that sports wagering must not be associated with or endorsed by the NCAA." Br. 27. Yet, four pages earlier, its Brief proclaims that it "***does not object***" to use of the phrase "NCAA Tournament" in connection with sports betting. Br. 23 (emphasis added). Nor could it credibly object: In April 2025, the NCAA appointed Genius "as the exclusive distributor of official NCAA data *to licensed sportsbooks for all post-season tournaments, including March Madness, through 2032*." Spencer Decl. ¶ Ex. 4 at 2 (emphasis added). That agreement not only provided in-game data "to the regulated sports betting market," but permitted sportsbooks to use "NCAA marks and

14

logos." *Id.*  Against that backdrop, the NCAA cannot credibly contend that it will suffer any injury if DraftKings continues to identify events on which consumers can lawfully bet in the exact same way it and countless third parties have for years.  At a minimum, the NCAA's own role in profiting from distribution of its data and marks to sportsbooks contradicts its claim that the association between the NCAA and sports betting is sudden, harmful, or warrants emergency relief.

The NCAA has known—or indisputably should have known, *see* Miles Decl. ¶¶ 20–21—about the challenged uses for years and has repeatedly chosen not to sue.  It delayed further this year, instead, appearing to have strategically "timed" its request for emergency relief in the middle of the March Madness tournaments, *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998), when "America is now watching," Br. 3.  But this is at least the fifth tournament during which DraftKings has made the same "use" of all of the challenged terms; yet the first and only time the NCAA has filed suit was last Friday.  The NCAA's "claim of irreparable injury is clearly belied by its own dilatory behavior."  *Gidatex, S.r.L*, 13 F. Supp. 2d at 420. Because the NCAA has failed to show irreparable harm, the Court should deny the TRO—it need not consider any other factor.  *See SouthernCare*, 2025 WL 3725592, at *7.

II.      **The NCAA Cannot Show a Likelihood of Success on Its Trademark Claims.**

For the reasons explained above, the NCAA's request fails without reaching the merits.  But even if the Court considers them, the NCAA cannot show a likelihood of success because its claims fail for multiple independent reasons: (A) All its claims are barred by laches; and (B) DraftKings' alleged use of the challenged terms does not violate the NCAA's trademark rights because there is no likelihood of confusion and its dilution claim is precluded by statute.

A.      **The NCAA's Claims Are Barred by Laches.**

The NCAA's claims are barred by laches.  To establish laches, DraftKings must show that the NCAA had "actual or constructive notice" of the allegedly infringing conduct, unreasonably

15

delayed in acting, and that DraftKings would be prejudiced. *Chattanooga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 795 (7th Cir. 2002). Courts in this Circuit look to Indiana's two-year statute of limitations for injury to personal property as a benchmark. *Gema USA, Inc. v. First in Finishing Inc.*, No. 1:22-cv-02053-TWP, 2025 WL 3073875, at *22 (S.D. Ind. Mar. 27, 2025).

That period expired long ago. The NCAA has had actual notice that DraftKings resumed its use of "March Mania" ***at least as early as 2019***, and again in 2021, when it acknowledged that DraftKings was using the terms "in the same manner" as before. Butterworth Decl. ¶¶ 15, 27, 29–30. And the NCAA has had at least constructive knowledge of DraftKings' open, public, and consistent use of "March Madness," and related terminology for at least ***five years***. *See* Miles Decl. ¶¶ 20–21. The NCAA does not—and cannot—claim that DraftKings materially changed its practices in the years that followed. The NCAA has ***for years*** been aware of the use it now claims is infringing and failed to take action. Its delay is both undisputed and inexcusable.

This years-long delay has prejudiced DraftKings. "Prejudice may be shown if the plaintiff's unexcused failure to exercise its rights caused the defendant to rely to its detriment and build up a valuable business around its trademark." *Chattanooga Mfg., Inc.*, 301 F.3d at 795. That is exactly what happened here. DraftKings has, for years, used widely understood terminology to refer to the tournament in the same way as the broader marketplace. An injunction now would require DraftKings to alter its platform mid-tournament, disrupt ongoing operations, and impair its ability to communicate clearly with users—including about whether they can continue to use DraftKings to bet on the tournament as they have for years. That is precisely the type of prejudice laches is meant to prevent. The NCAA's claims are time-barred.

**B. DraftKings' Use of the NCAA Basketball Marks Does Not Infringe the NCAA's Trademark Rights.**

The NCAA's theory of infringement rests on the premise that DraftKings may not refer to

16

the March Madness tournaments or their rounds by their commonly understood names. That is not the law. Trademark rights do not "deprive commercial speakers of the ordinary utility of descriptive words." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004). They protect against confusion as to source—not accurate references to a product or event.

This case involves precisely the type of referential use courts recognize as both lawful and beneficial to consumers: using a mark to identify the plaintiff's own product or event. The NCAA mischaracterizes *Gema USA* as rejecting nominative fair use outright. But *Gema USA* did not hold that referential use is irrelevant; it held that, in this context, the traditional likelihood-of-confusion analysis must be applied differently. *See* 2025 WL 3073875, at *18. Specifically, where a defendant uses a mark to refer to the plaintiff's product, factors such as similarity of marks and strength of the mark "carry little weight," while the more probative considerations are actual confusion, intent, and consumer care. *Id.* at *20. That approach reflects a fundamental principle: allowing truthful reference enables consumers to "learn at a glance what kind of product" is being offered. *Id.* at *18. The NCAA's approach would invert that principle by prohibiting accurate references to widely followed public events—an outcome trademark law does not permit or require.

        1.     *Consumers Are Not Likely to Be Confused by DraftKings' Use of Commonly Understood Tournament Terminology.*

Actual confusion, intent, and consumer care are the factors that matter most in a referential-use case. *See Gema USA*, 2025 WL 3073875, at *18, *20; *see also Dwyer Instruments, Inc. v. Sensocon, Inc.*, 873 F. Supp. 2d 1015, 1030–31 (N.D. Ind. 2012). These factors all compel the conclusion that consumers are not likely to believe that DraftKings' Sportsbook platforms or DraftKings Network is sponsored by or affiliated with the NCAA simply because DraftKings uses commonly understood terminology to identify the tournament and its rounds. *See Packman v. Chi.*

17

*Trib. Co.*, 267 F.3d 628, 641 (7th Cir. 2001).

*Actual confusion*.  Actual confusion is one of the most important factors—and carries even more weight in nominative fair use cases.  *See Gema USA*, 2025 WL 3073875, at \*18; *see also, e.g.*, *Forest River, Inc. v. inTech Trailers, Inc.*, 699 F. Supp. 3d 712, 728 (N.D. Ind. 2023). "Evidence that a person or corporation mistakenly purchased defendant's product or services while intending to purchase plaintiff's product or services" is needed to establish actual confusion.  *MB Fin. Bank, N.A. v. MB Real Est. Servs., L.L.C.*, 2003 WL 21462501, at \*18–19 (N.D. Ill. June 23, 2003).

Here, despite **years** of widespread, public, and highly visible use, the NCAA identifies no instance of actual consumer confusion—no complaint, inquiry, or misdirected communication suggesting even one user believes DraftKings' Sportsbook platforms or DraftKings Network is affiliated with, or sponsored or endorsed by, the NCAA.  This absence is significant.  *See Nike, Inc. v. Just Did It Enters.*, 6 F.3d 1225, 1231 (7th Cir. 1993) ("proper … to infer from the absence of actual confusion that there was also no likelihood of confusion").

The NCAA instead relies on unverified, and in some cases anonymous, social media comments—the majority of which respond to news of *this lawsuit*.  Br. 16.  They do not reflect confusion because they do not indicate that the commenters even saw the accused uses.  *See Packman*, 267 F.3d at 645 (dismissing alleged evidence of confusion because plaintiff failed to "show that the four individuals had purchased or attempted to purchase" goods "from defendants, and thus they were not relevant 'consumers' under the Lanham Act").  They reflect criticism of the NCAA.  For example, the comment "So the ncaa is suing a major revenue stream because that stream is using its name/image/likeness?," Br. 16, does not express any confusion about whether the NCAA sponsors the services DraftKings offers, but rather is commenting on the fact that the

18

NCAA provides data to sports betting companies through Genius. This is not trademark confusion.

***Intent.*** The NCAA also cannot show that DraftKings intended to create confusion. The defendant's intent is one of the "most important" factors, *Forest River, Inc.*, 699 F. Supp. 3d at 728; *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 678 (7th Cir. 2001), that carries even more weight in the nominative fair use context, *Gema USA*, 2025 WL 3073875, at *18. DraftKings uses the challenged terms to identify the tournament and its rounds so that users can understand the events on which they are placing bets. Butterworth Decl. ¶¶ 19–21. That is a legitimate and necessary use—not an attempt to pass off DraftKings' services as those of the NCAA. DraftKings' conduct mirrors widespread industry practice, further confirming the absence of any intent to confuse—which is the relevant standard. *See, e.g.*, *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 600–01 (7th Cir. 2019).

DraftKings prominently uses its own name and branding, which further dispels any likelihood of consumers associating it with the NCAA. The NCAA's suggestion that DraftKings uses "the NCAA's design marks" is flatly incorrect. Br. 16. When referencing March Madness and the other challenged terms, DraftKings does not "use distinctive font, typeface, or lettering unique to the Plaintiff's mark." *Dwyer Instruments, Inc.*, 873 F. Supp. 2d at 1031; Butterworth Decl. ¶ 8. Because the asserted marks appear, in the same style, font, and color, alongside similar references to other sporting events and are used solely to identify those events, DraftKings does not use more of the Mark than is reasonably necessary to identify the Plaintiff's product. *Chanel, Inc. v. The RealReal, Inc.*, 449 F. Supp. 3d 422, 439 (S.D.N.Y. 2020); *see also S Indus., Inc. v. GMI Holdings, Inc.*, 1998 WL 67627, at *9 (N.D. Ill. Jan. 30, 1998) (lack of intent to pass off defendant's product as plaintiff's where defendant used mark in different font, colors, and without plaintiff's source identifying terms); *Door Sys., Inc. v. Overhead Door Sys., Inc.*, 905 F. Supp.

492, 496 (N.D. Ill. 1995) (same, where defendant clearly stated designation of origin and used different colors, typeface, and stylization of letters).  Nothing about DraftKings' platform suggests sponsorship or affiliation.[3]

***Consumer care.***  The degree of consumer care weighs against confusion. DraftKings users know and follow sports.  At least one court has recognized that people who patronize gambling establishments exercise a high degree of care.  *See Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 847–48, 882 (N.D. Ill. 1999).  They are unlikely to mistake a plainly branded DraftKings Sportsbook platforms for an NCAA product simply because it uses the phrase "March Madness" to identify the event or particular round of an event on which they are betting.  *See Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997) ("[W]here consumers are sophisticated, deliberative buyers, confusion is less likely.").

The betting process also demonstrates that consumers exercise care.  A user must make three separate selections, across three separate screens, to successfully enter a bet on a March Madness game on DraftKings Sportsbook platforms.  Butterworth Decl. ¶ 18.  That presents numerous occasions for a user to consider its selection, and the longer a user spends considering a selection, the less likely there is to be confusion.  *See Metavante Corp. v. Medavant, Inc.*, 2006 WL 1277903, at *4 (E.D. Wis. May 5, 2006) ("The more a consumer is likely to research a product before purchasing it, the less likely the consumer is to confuse different trademarks.").  As this Court has recognized, where consumers take great care, it weighs heavily against confusion.  *See Gema USA*, 2025 WL 3073875, at *19.

---

[3] At most, the NCAA complains that DraftKings recently removed "the NCAA's logos and designs" from its platforms.  Br. 25.  But those were logos that appeared in news coverage on the DraftKings Network platform, not trademark use, and were removed in an attempt to avoid this litigation. There is no basis for emergency relief to require conduct DraftKings has already undertaken.

***Similarity and strength.*** The NCAA spends almost half its Brief arguing that its marks are strong and that DraftKings references the NCAA's actual marks. Br. 2–5, 8–9, 12–15, 18–19, 28. But as this Court concluded, in "cases of alleged nominative fair use," the similarity between the marks at issue and the strength of the plaintiff's marks "carry less weight" because the use is, by definition, referential. *Gema USA*, 2025 WL 3073875, at *18. DraftKings uses the same terms consumers use to refer to the NCAA's tournament. As a result, the NCAA's heavy reliance on the similarity and strength factors is entirely misplaced.[4]

The context in which these marks are allegedly used clearly demonstrates why consumer confusion has not occurred over the many years DraftKings has been referencing the terms at issue. DraftKings' use of these terms is not unique—it reflects standard market practice, including widespread use of "March Madness," "Sweet 16," "Elite 8," and "Final 4" by DraftKings' competitors. Murphy Decl. ¶¶ 8–15. The same is true outside the betting context: those terms are pervasively used across sports media, broadcasting, and everyday commercial promotions.

Courts regularly recognize that when "the marketplace is replete with products using a particular trademarked word," it "indicates not only the difficulty in avoiding its use but also, and directly, the likelihood that consumers will *not* be confused." *See EMI v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002); *see also Top Tobacco, L.P. v. N. Atlantic Operating Co., Inc.*, 2007 WL 118527, at *7 (N.D. Ill. Jan. 4, 2007) (finding no likelihood of confusion where "there are many other users of the word 'top' in the tobacco market"). So too here: widespread third-party usage

---

[4] The NCAA's complaint challenges not only DraftKings' use of "March Madness" and other marks it claims to own or have applied to register, but also DraftKings' use of the phrase "March Mania"—a phrase the NCAA does not use and for which it asserts no trademark rights. *E.g.*, Compl. ¶¶ 59–62. The NCAA's Brief does not address "March Mania." Accordingly, DraftKings does not address the NCAA's likelihood of success as to that phrase here. In any event, any infringement theory based on a term in which the NCAA has *no rights* or even *alleged rights* would be even weaker than those addressed herein.

of the marks the NCAA has put at issue clearly demonstrates that consumers expect to encounter these terms across a range of unaffiliated contexts and do not interpret their use as signaling sponsorship or endorsement by the NCAA.  *See Eastland Music Grp., LLC v. Lionsgate Ent., Inc.*, 707 F.3d 869, 871–72 (7th Cir. 2013) (affirming dismissal of complaint where plaintiff "does not (and could not plausibly) allege that consumers" view the challenged use as indicative of "the producer or source" because plaintiff "entered a crowded field" of similar marks).  No consumer believes that a bar advertising "March Madness drink specials" or a newspaper running a "March Madness" headline is sponsored by the NCAA.  DraftKings' use operates in the same referential way.  Thus, while the NCAA asserts that its marks are strong, that strength cuts both ways:  the more widely recognized "March Madness" is as the name of the tournament itself, the less likely consumers are to interpret its use as indicating sponsorship or affiliation.

Nor is there any practical substitute for the terminology DraftKings uses.  "March Madness" is the name by which the tournament is universally known.  The NCAA's proposed alternatives—"NCAA Tournament" or "Division I" "college basketball" tournament, Br. 23—are not only cumbersome but ambiguous, as multiple Division I tournaments occur simultaneously, including the National Invitation Tournament, also operated by the NCAA, and the College Basketball Crown.  The NCAA's proposed alternatives would, if anything, *increase* confusion among consumers because they fail to identify a specific event.  Using the terminology consumers actually recognize *reduces* confusion; prohibiting its use would have the opposite effect.

The NCAA's position is also inconsistent.  It contends use of "March Madness" creates confusion, but use of its preferred alternative, "NCAA Tournament," does not—even though "NCAA" is a trademark.[5]  *See* Br. 23.  The NCAA offers no explanation for why consumers would

_____

[5] *See* Reg. Nos. 72361868, 73677388, 73677626, 76045145, and 76046493, among others.

22

be confused in one instance but not the other.  If consumers understand "NCAA Tournament" refers to the NCAA's event without implying sponsorship by every speaker who uses it, the same must be true of "March Madness," the far more commonly used name for that same event.

Furthermore, the NCAA's Brief misleadingly shifts its definition of the "NCAA Basketball Marks" to include terms for which it does not hold registered rights.  On page 1 of the Brief, the NCAA defines this term as collectively the registered trademarks "March Madness," "Final Four," "Elite Eight," and "NCAA Sweet Sixteen."  Just two pages later, the NCAA expands this definition to include terms for which it has, at best, only applied to register but that the U.S. Patent and Trademark Office has yet to approve, such as "Elite 8."  The NCAA then repeatedly asserts that the "NCAA Basketball Marks" are "protected by multiple incontestable trademark *registrations*." *Id.* at 11 (emphasis added); *see also id.* at 12, 15.

***Similarity of services.***  The parties' services are not similar in any confusion-producing sense.  The NCAA operates basketball tournaments.  DraftKings operates a sportsbook and sports-media platform.  The NCAA dedicates a significant portion of its complaint and Brief to describing the many ways in which sports betting is antithetical to the NCAA's "values, philosophy, and policy." *E.g.*, Br. 6–8; Compl. ¶¶ 40–46.  The NCAA does not believe the parties' services are similar.  It cannot simultaneously claim that consumers believe they are.

The NCAA's reliance on a single search-results page is also misplaced.  Br. 14 (citing Miles Decl. Ex. D).  The results shown are not paid advertising by DraftKings, but instead appear to be organic search results suggested by Bing.  And when the NCAA provided this same page to DraftKings on March 17, 2026, DraftKings explained in a letter on March 18, 2026 that the "results . . . are broken links that do not lead to any live pages hosted by DraftKings.  Rather, when clicked, they display a 404 error."  Butterworth Decl. Exs. 13, 15.  This outdated "evidence" does not

support a likelihood of confusion.

The primary factors—actual confusion, intent, and consumer care—cut decisively against the NCAA. The NCAA's theory would effectively require a license to refer to a nationally prominent event using its ordinary name. Treating accurate references to the tournament's name as infringement would expand trademark law beyond the prevention of confusion and into control over ordinary language. The NCAA cannot show likelihood of success on its infringement claims.

> 2.     *DraftKings' Use of the NCAA Basketball Marks on DraftKings Network Is Not Trademark Infringement.*

The NCAA's trademark claim is also subject to dismissal because it is not "trademark use" for DraftKings to post articles on DraftKings Network that reference the NCAA's marks in article titles and text to identify the subject of sports reporting and commentary. *See Packman*, 267 F.3d at 639 (affirming summary judgment for *The Chicago Tribune* in suit challenging its use of a trademark in a headline reprinted onto memorabilia); *Radiance Foundation, Inc. v. N.A.A.C.P.*, 786 F.3d 316, 326 (4th Cir. 2015) (use of a mark in the title or body of an article to identify the subject of commentary is not actionable under the Lanham Act). In fact, this court and the Indiana Supreme Court have both held that DraftKings' online fantasy sports operations fall within statutory protections for coverage of "newsworthy" activities. *See Daniels v. FanDuel, Inc. & DraftKings, Inc.*, No. 1:16-cv-01230-TWP, 2017 WL 4340329, at *5 (S.D. Ind. Sept. 29, 2017); *Daniels v. FanDuel, Inc. & DraftKings, Inc.*, 109 N.E.3d 390, 392 (Ind. 2018). Because the asserted NCAA Marks are widely accepted references to the NCAA tournament and its rounds, the NCAA's attempt to prevent commentary and expressive activities about those games are precluded by black-letter trademark law. *See, e.g., Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002) ("Trademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view"); *CBS*

24

*Interactive Inc. v. NFL Players Ass'n*, 259 F.R.D. 398, 417–19 (D. Minn. 2009) (use of sports names and other identifying terms in connection with sports-related content, including fantasy sports games, is protected by the First Amendment).

The same reasoning applies here. First, as the Seventh Circuit concluded in *Packman*, DraftKings prominently discloses its own identity as the source of its services on the digital version of its "masthead," the name and icon for its app, and the domain name and header of its website. 267 F.3d at 639–40. Second, the fact that DraftKings offers information about and opportunities to bet on March Madness along with a variety of other unrelated sporting activities from other sources "significantly reduces any chance of confusion." *Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 484–86 (5th Cir. 2004) (where the marks at issue are listed with several other "brand names" such that none are "especially prominent," consumers are unlikely to conclude that the defendant "is affiliated with or approved by" the plaintiff any more than the other brand names). Third, the conclusion that DraftKings is not using the NCAA marks as trademarks is "evidenced" by the fact that so many others in the industry reference the NCAA tournament and its stages in the exact same way. *Packman*, 267 F.3d at 640; *supra* Statement of Facts, Section C. In short, because DraftKings' uses the NCAA's marks to identify the relevant events in good faith, the NCAA's infringement claim cannot succeed.

### C. The NCAA's Dilution Claim Is Barred by the Lanham Act's Nominative Fair Use Exception.

The NCAA's separate dilution claim fails for the same reasons. Even though the Seventh Circuit has not adopted nominative fair use as an affirmative defense to trademark *infringement* claims, Congress created a nominative fair use defense for trademark *dilution* claims. *See* 15 U.S.C. § 1125(c)(3)(A). As a result, the NCAA's dilution claim is explicitly prohibited.

The exclusion applies where the challenged use: (1) identifies another party's goods or

25

services; (2) lacks source-identifying function; and (3) is made in good faith.  *See Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d at 330–31.  DraftKings uses "March Madness" and the other terms at issue to identify this specific NCAA college basketball tournament, presents them in plain text without NCAA branding, and does so without any intent to suggest affiliation.  That falls squarely within the protected use contemplated by the statute.  *See Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 802–03 (9th Cir. 2002) (finding nominative fair use where the defendant used "Playboy Playmate of the Year 1981" to identify herself because the phrase identified the plaintiff's product and did not suggest sponsorship).  DraftKings is not using the marks to brand its own services, but rather to tell consumers the events on which they can bet.  Even where descriptive alternatives may exist, such as "college basketball tournament," they "need not be employed where use of a mark is necessary to refer to a specific brand or product."  *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 893–94 (9th Cir. 2019).  No reasonable consumer would understand DraftKings' references to March Madness, Final 4, Elite 8, Sweet 16, or March Mania as branding for DraftKings itself.  They function only as labels telling consumers what tournament or round they are engaging with.

Further, DraftKings refers to the NCAA's March Madness and related marks in good faith—to refer to the NCAA's own tournament.  That is the opposite of an effort to pass off DraftKings' services as those of the NCAA.  *See Allied Interstate LLC v. Kimmel & Silverman P.C.*, 2013 WL 4245987, at *4 (S.D.N.Y. Aug. 12, 2013) (rejecting dilution claim where use did "not create an improper association" but instead identified the trademark holder's own product).

The NCAA's dilution claim rests on the proposition that any association with sports betting tarnishes its reputation.  The cases the NCAA cites involve cybersquatting and impersonation— conduct not present here.  *See NCAA v. BBF Int'l*, 2001 BL 1468 (E.D. Va. Mar. 16, 2001) (ncaa-

26

march-madness.com and ncaabettinglines.com); *3M Co. v. Christian Investments LLC*, 2012 WL 6561732 (E.D. Va. July 12, 2012) (mmmbet.net).   DraftKings operates under its own clearly branded website and app, neither of which incorporate any NCAA marks in the name.   The NCAA's disagreement with lawful commercial activity provides no basis for a dilution claim. *Hugunin v. Land O' Lakes, Inc.*, 815 F.3d 1064, 1067 (7th Cir. 2016).

The NCAA's position is further undermined by its own conduct.   The NCAA-Genius partnership enables sportsbooks to license NCAA event data and trademarks.   That partnership is inconsistent with the NCAA's claim that accurate references to the tournament's name by sportsbooks tarnish its brand.   Putting aside the NCAA's inconsistency, DraftKings is a legal and licensed sportsbook that paid millions of dollars in taxes last year in this State.   Butterworth Decl. ¶ 55.  It is the industry leader in responsible gaming.  Spencer Decl. Ex. 14.  And it has relationships and partnerships with some of the most prominent athletes and businesses in the world. Butterworth Decl. ¶ 56.  For the NCAA to say that its mere association with DraftKings tarnishes its mission statement and brand is nonsensical and offensive.

At bottom, the NCAA asks this Court to use trademark law to restrict a longstanding, widespread practice of making truthful references to a widely recognized public event.  Trademark law does not support that result.  It protects against confusion—it does not provide a right to control engagement with a national sporting event.

### III.        The Balance of Equities Overwhelmingly Favors DraftKings.

The balance of equities decisively favors DraftKings.   The NCAA does not identify any harm from the many years that DraftKings has been making the same referential use that the NCAA now contests.  But its request to "disrupt the status quo," *Youngblood v. Wilson*, 2008 WL 215739, at *1 (N.D. Ind. Jan. 24, 2008), would impose immediate and substantial disruption on DraftKings and its customers.  The purpose of emergency relief is "to minimize the hardship to the parties

27

pending the ultimate resolution of the lawsuit." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002) (citation omitted). The NCAA's request would do the opposite.

The NCAA's inexplicable "years-long delay in asking for preliminary injunctive relief weigh[s] against" a TRO. *Benisek v. Lamone*, 585 U.S. 155, 160 (2018). The NCAA claims it "has spent decades building the MARCH MADNESS® and FINAL FOUR® brands." Br. 28. But it did nothing—for years—as DraftKings and its competitors openly, publicly, and continually used the challenged terminology to identify those events. *See supra*. The NCAA's purported "policies prohibiting gambling advertising in connection with its events" are belied by its own conduct—including its exclusive partnership with Genius to distribute NCAA data and license NCAA marks to sportsbooks. Having tolerated—and benefited from—the very activity it now challenges, the NCAA cannot claim that equity favors emergency intervention.

By contrast, a TRO would impose immediate and substantial harm on DraftKings. Removing commonly used event names from DraftKings' Sportsbook platforms and other content channels during an active tournament would require significant operational, engineering, and content changes across multiple systems. For example, personnel would have to manually sift through each and every impacted market and overwrite its title, a process that must be repeated for every state with collegiate or other specific wagering restrictions requiring a separate instance of its Sportsbook platform. *See* Butterworth Decl. ¶¶ 39–42. A conservative estimate of the time required to accomplish remediation would likely exceed 78 hours. *Id.* To the extent the marks are used in bet "blurbs" explaining details and rules about a bet, removal of the terms would require changing of a bet's rules after it is placed, which is not permitted. Sudden changes to the naming conventions used for the navigation tabs and other section headings that users have become accustomed to over years of interacting with DraftKings' Sportsbook platforms risks substantially

28

confusing and frustrating those customers and harming DraftKings' reputation and goodwill. It also would impair DraftKings' ability to communicate clearly with users about available betting markets. Courts routinely deny emergency relief where, as here, an injunction would require an overhaul of ongoing operations in real time. *Vienna Beef, Ltd. v. Red Hot Chicago, Inc.*, 833 F. Supp. 2d 870, 877 (N.D. Ill. 2011) (denying TRO that would require defendant to alter much of its advertising and promotional material); *see also Caterpillar Inc. v. Walt Disney Co.*, 287 F. Supp. 2d 913, 923 (C.D. Ill. 2003) (balance of harms favored defendants where injunction would "entail the disruption of simultaneous marketing campaigns," "require mounting another … marketing campaign," and "result in the loss of more time").

The NCAA's requested TRO also would create the very confusion trademark law is meant to prevent. It would require DraftKings to replace widely understood, universally used terminology with unfamiliar and imprecise alternatives in the middle of the tournament. The phrases at issue—especially "March Madness" and "Final 4"—are how the public actually refers to these events. The NCAA itself identifies nearly ***10,000*** references to "March Madness" in articles in major US newspapers since 2016. Br. 4. Generic alternatives such as "College Basketball," "Division I," or "NCAA Tournament," Br. 23, would not provide equivalent clarity; *multiple* NCAA Division I basketball tournaments occur simultaneously, Butterworth Decl. ¶ 19. Consumers do not refer to the Elite 8 as the Division 1 College Basketball Championship Quarterfinals—nor would they understand that those two phrases refer to the same thing. Consumers use language that is universally understood, which is why DraftKings and its competitors have referred to March Madness in describing their lawful sports betting offerings for years. Forcing DraftKings to abandon commonly understood terminology would reduce clarity for consumers, not enhance it.

29

In short, the NCAA seeks to impose immediate and substantial disruption based on a claimed harm it tolerated for years.  The balance of harms weighs decisively against injunctive relief.  *See Kastanis v. Eggstacy LLC*, 752 F. Supp. 2d 842, 859 (N.D. Ill. 2010).

## IV.    The Public Interest Weighs Against A TRO.

The public interest weighs against the extraordinary relief the NCAA seeks.  There is a strong public interest in protecting truthful, non-misleading speech—particularly where consumers rely on clear information to make decisions involving real money.  *See Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010) ("A trademark injunction, particularly one involving nominative fair use, can raise serious First Amendment concerns because it can interfere with truthful communication between buyers and sellers in the marketplace.").

The public also has a substantial interest in clear and accurate descriptions of betting markets.   The NCAA asserts that DraftKings' use of commonly understood terminology "exacerbate[s] consumer confusion," but it offers no evidence of any such confusion.  That absence of evidence is dispositive.  *See Vienna Beef, Ltd.*, 833 F. Supp. 2d at 877 (denying TRO where plaintiff failed to offer any evidence of confusion).

The NCAA's requested relief also would effectively grant it control over how third parties refer to a major, widely followed public event.  Trademark law does not confer a right to control ordinary language in this way—particularly where that language reflects widespread, industry-wide usage and is necessary for clear communication with consumers.

In sum, the public interest favors clarity, truthful communication, and consistency with how consumers actually understand and refer to these events.  The NCAA's requested injunction would undermine those interests, not advance them.

## CONCLUSION

The Court should deny the NCAA's request for a TRO.

DATED: March 25, 2026

                                              /s/ Zachary A. Myers

ORIN SNYDER (*pro hac vice*)                  ZACHARY A. MYERS
osnyder@gibsondunn.com                        zmyers@mccarter.com
ILISSA SAMPLIN (*pro hac vice*)               KAYLIN OLDHAM COOK
isamplin@gibsondunn.com                       kcook@mccarter.com
GIBSON, DUNN & CRUTCHER LLP                   MCCARTER & ENGLISH, LLP
200 Park Avenue                               10 E Main Street
New York, NY 10166                            Suite 200
Telephone: 212.351.4000                       Carmel, IN 46032
                                              Telephone: 317.810.5495

- *and-*

THOMAS DUPREE (*pro hac vice*)                MEGAN K. BANNIGAN
tdupree@gibsondunn.com                        mkbannigan@debevoise.com
HOWARD HOGAN (*pro hac vice*)                 DAVID H. BERNSTEIN
hhogan@gibsondunn.com                         dhbernstein@debevoise.com
JACOB SPENCER (*pro hac vice*)                JARED I. KAGAN
jspencer@gibsondunn.com                       jikagan@debevoise.com
GIBSON, DUNN & CRUTCHER LLP                   DEBEVOISE & PLIMPTON LLP
21700 M Street NW                             66 Hudson Boulevard
Washington, DC 20036                          New York, NY 10001
Telephone: 202.955.8500                       Telephone: 212.909.6000


                                              *Attorneys for DraftKings Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

*/s/ Zachary A. Myers*
Zachary A. Myers