**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:26-cv-00557-TWP-MG |
| DRAFTKINGS, INC., | ) ) ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER**

This matter is before the Court on a Motion for Temporary Restraining Order ("TRO") (Filing No. 3) pursuant to Federal Rule of Civil Procedure 65(b) filed by Plaintiff National Collegiate Athletic Association ("NCAA"). NCAA initiated this action against Defendant DraftKings, Inc. ("DraftKings") seeking preliminary and permanent injunctive relief. (Filing No. 1). The Complaint alleges the following claims: Count I: Trademark Infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; Count II: Trademark False Association and Unfair Competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and Count III: Federal Trademark Dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) (Filing No. 1). The Court has considered the parties' briefs, declarations, and oral arguments held on March 26, 2026. For the reasons explained in this Order, the NCAA's TRO is **denied**.

### I.    BACKGROUND

**A.    The NCAA Men's and Women's Division I Basketball Tournaments**

The NCAA Division I Men's and Women's Basketball Tournaments (the "Tournaments") began on March 19, 2026 (Filing No. 17 at 2). The Tournaments are two of the most watched sporting events in the United States. *Id*. The NCAA Division I Men's Basketball Tournament began

in 1939 when it was only an 8-team event. *Id*. In 1982, the NCAA expanded to include the Division I Women's Basketball Tournament. *Id*. Today, the fields of both Tournaments include 68 teams each, competing in a single-elimination format across four regional brackets, culminating in the NCAA SWEET SIXTEEN®, ELITE EIGHT®, AND FINAL FOUR® games and, finally, the National Championship games. *Id*. The Tournaments span approximately three weeks each March, with the first full round of games occurring on the third Thursday and Friday of March. *Id*. Games are broadcast across national television networks and screening platforms including CBS, Turner, TNT and other affiliates. *Id*.

In 2025 alone, the men's and women's semi-final games offered under the FINAL FOUR® mark totaled tens of millions of viewers, and the Tournaments offered under the MARCH MADNESS® mark overall totaled hundreds of millions of viewers (Filing No. 22 at 3). By 2010, in-person attendance for the Division I Men's Basketball Tournament exceeded 700,000. The in-person attendance numbers have remained similar through 2025. *Id*. Further, the 2025 Women's Division I Basketball Tournament's in-person attendance exceeded 350,000. *Id*. at 4.

For more than a decade, the Tournaments have had similar broadcasting viewership and in-person attendance exposing more than 100 million individuals to the NCAA's taglines MARCH MADNESS®, FINAL FOUR®, ELITE EIGHT®, and NCAA SWEET SIXTEEN®.

**B.    <u>The NCAA Basketball Marks</u>**

Throughout the 1980s, 90s, and beyond, the NCAA adopted and began using a number of trademarks in connection with the Tournaments including: MARCH MADNESS®; FINAL FOUR® and FINAL 4®; ELITE EIGHT® and ELITE 8™; NCAA SWEET 16®, NCAA SWEET SIXTEEN® and SWEET 16™; and NCAA MARCH MADNESS® and logo (collectively, the "NCAA Basketball Marks") (Filing No. 17 at 3–5). The NCAA Basketball Marks are owned by

the NCAA, are valid, subsisting, and in full force and effect, some of which have reached incontestable status under 15 U.S.C. § 1065. *Id*.

For more than four decades, the NCAA has used the NCAA Basketball Marks continuously and extensively in connection with its annual Tournaments and related services. *Id*. at 6. The NCAA's revenue from multimedia and marketing rights to the Men's Tournament reaches over $900 million annually (Filing No. 22 at 1). A search in the LexisNexis "Major US Newspapers" database for MARCH MADNESS® returns nearly 10,000 press pieces covering the Tournaments since 2016 (Filing No. 18 at 7, Filing No. 18-25, Filing No. 18-26, Filing No. 18-27). From February 17, 2026, through March 19, 2025, MARCH MADNESS® had approximately 2.7 million consumer engagements across all social media platforms (Filing No. 22 at 11).

**C.    The NCAA's Use of Its Marks**

The NCAA utilizes a combination of commercial monitoring services, periodic monitoring of the marketplace, and relies on its staff, community members, and corporate partners and affiliates to identify and report infringements of its NCAA Basketball Marks (Filing No. 17 at 6–7). In the last 10 years, the NCAA has sent more than 500 cease and desist letters, conducted hundreds of social media and web take downs, filed more than 90 extensions of time to oppose, oppositions, and/or cancellation actions before the Trademark Trial and Appeal Board, and filed suit in federal court to protect the NCAA Basketball Marks. *Id*. at 7. Since January 5, 2026, the NCAA has sent more than 50 cease and desist letters seeking to stop unauthorized use of the NCAA Basketball Marks. *Id*.

The NCAA's Advertising and Promotional Standards impose requirements on any use of NCAA marks, logos, or indicia, including detailed standards governing which entities may use NCAA intellectual property and under what conditions. *Id*. at 8; (Filing No. 17-2). The NCAA

specifically prohibits commercial relationships with sports books—which are platforms or venues where individuals can place bets on the outcomes of sporting events—and is the only major sports league in the United States to expressly prohibit any association of its trademarks with sports books (Filing No. 17 at 9).

Since 2018, the NCAA has partnered with Genius Sports a/k/a Betgenius ("Genius"), a company whose core business is providing in-game data to sportsbooks (Filing No. 54-2). In April 2025, the NCAA and Genius expanded their relationship. According to Genius' press release, it is "the exclusive distributor of official NCAA data to licensed sportsbooks for all post-season tournaments, including March Madness" and "ensures the delivery of fast, accurate, and secure data to the regulated sports betting market." (Filing No. 54-4 at 2).

Because NCAA knew that sports gambling was happening, it decided to leverage its date to see whether it could get Genesis to accept some integrity obligations in an agreement. As part of the agreement, Genius offers licensed sportsbooks "exclusive access to official NCAA data feeds alongside NCAA marks and logos." *Id*. But in order for sportsbooks to receive official NCAA data, they must agree to the following obligations: (1) prohibition of high-risk prop bets, including those targeting individual athlete underperformance, injuries, or other exploitative outcomes; (2) cooperation with NCAA investigations; (3) sharing of suspicious betting activity and integrity-related information; (4) ongoing monitoring and enforcement tied to continued access to data; and (5) supporting the NCAA's Draw the Line responsible gambling campaign (Filing No. 55 at 3). Because NCAA knew that sports gambling was happening, it decided to leverage its date to see whether it could get Genesis to accept some integrity obligations.

**D.    The NCAA's Position on Gambling**

The NCAA's opposition to associating its brand, the Tournaments, and the participating student-athletes with sports wagering is based on the NCAA's belief that sports betting jeopardizes competitive integrity, endangers student-athletes, and invites manipulation of games. *Id*. For decades the NCAA has engaged in sustained public advocacy warning of the harms of sports betting in collegiate athletics. *Id*.

The NCAA's position against sports betting is based in part on studies commissioned by the NCAA regarding participation in and effects of gambling activities by student-athletes in 2004, 2008, 2012, 2016, 2024, 2025, and 2026, which revealed a high frequency of sports wagering among student-athletes. *Id*. at 7–11. The studies further indicated that 36% of Division I men's basketball student-athletes reported experiencing social media abuse related to sports betting within the last year from November 2025, and that number grew to 46% in February 2026. *Id*. at 10.

The NCAA has also undertaken anti-gambling initiatives to educate student-athletes on the harms of gambling, eliminate gambling-related abuse, and safeguard competitive integrity. The NCAA's "Don't Bet On It" campaign, launched in 2005, focuses on education and prevention by explaining the NCAA's gambling rules, the risks of wagering, and the real-world consequences of gambling-related harm. *Id*. at 11–12. In 2024, the NCAA launched the "Draw the Line" campaign, which focused on educating student-athletes on the effects of sports betting while also addressing problem gambling for all who consume and participate in college sports. *Id*. at 12. Most recently, in 2025, the NCAA launched its "Don't Be A Loser" campaign aimed directly at bettors, calling attention to the alarming prevalence of abuse and harassment student-athletes face from angry fans

who lost a bet, condemning gambling-driven abuse and harassment of student-athletes, and warning that such conduct causes real and unacceptable harm. *Id*. at 13.

**E.**     **DraftKings Use of the NCAA Basketball Marks**

DraftKings is a Nevada corporation with its principal place of business in Massachusetts (Filing No. 43 at 1). DraftKings operates a digital sports entertainment platform that provides users with access to sports-related information, content, and interactive features, including the ability to follow sporting events, access statistics and analysis, engage with editorial content, and, where permitted by law, place bets on those events. DraftKings' Sportsbook is available through its website and its Sportsbook mobile app. DraftKings also operates a website called DraftKings Network, where it publishes news articles and analyses concerning sports, fantasy sports, and sports betting (Filing No. 53 at 2).

DraftKings began using the phrase "March Madness" on its platform to identify the Tournaments as early as 2021. *Id*. at 3. DraftKings has also been using the phrase "March Madness" on the DraftKings Sportsbook platforms since as early as 2023. *Id*. at 3–4. DraftKings Network has also displayed the phrase "March Madness" in website articles since as early as 2020. *Id*. Among other uses, DraftKings embedded the NCAA Basketball Marks into betting menus, promotional graphics, and marketing publications (Filing No. 18-2–18-9).

The DraftKings Sportsbook mobile application and websites displayed the NCAA Basketball Marks as a navigation category in the primary sports menu (Filing No. 18-8). The phrase "MARCH MADNESS" appears as a dedicated section within the DraftKings betting interface, used to organize and present wagering options for the Tournaments. *Id*. The phrase "MARCH MADNESS" also appeared as a primary category label above a menu of betting lines for the opening rounds of the Tournaments which commenced last week. In addition, "MARCH

MADNESS" is being used as a category label, with "SWEET 16", "ELITE 8", and "FINAL 4" presenting wagering options for the regional semifinals, regional finals, and national semifinals, respectively. *Id*.

In 2015, and in 2021, the NCAA sent a cease-and-desist letter to DraftKings concerning their use of the phrase "March Mania" in their advertising (Filing No. 53-5, Filing No. 53-7) In 2015, DraftKings stopped using the phrase "March Mania", but resumed sometime in 2020 (Filing No. 53-9) In March 2021, DraftKings, responding to the cease-and-desist letter from the NCAA, stated that their use of "March Mania" was not prohibited. *Id*. The NCAA did not respond.

On March 20, 2025, the NCAA, through Associate Counsel Leilyn Miles, contacted DraftKings about their use of "March Mania" and requesting DraftKings immediately cease use of the phrase (Filing No. 53-11). The NCAA attached both the 2015 and 2021 cease-and-desist letters to this communication. *Id*. On April 4, 2025, the NCAA brought in outside counsel to communicate with DraftKings, who sent another cease-and-desist letter once again concerning DraftKings use of "March Mania" for its marketing (Filing No. 53-12). DraftKings' counsel responded by stating that their use of the phrase "March Mania" was not prohibited, and "[i]n the present case, [DraftKings] is not using 'March Madness' at all, but 'March Mania.'" (Filing No. 53-13 at 3.

On March 3, 2026, the NCAA sent a cease and desist letter to DraftKings's counsel demanding that DraftKings: (1) cease and/or refrain from any and all use of the NCAA Basketball Marks; (2) destroy and/or revise any uses DraftKings may have in its possession including its betting platforms and any other infringing or dilutive articles; (3) agree in writing not to use NCAA's MARCH MADNESS® mark and/or any confusingly similar variations in the future; and (4) refrain from taking any other action that infringes or contributes to the infringement of the

NCAA's trademark rights (Filing No. 18-19). DraftKings responded on March 10, 2026, stating that despite their disagreement with the NCAA's assertions that the appearance of "March Madness" on those pages was impermissible, the pages including the "MARCH MADNESS" were taken down (Filing No. 18-20). DraftKings also stated that they believe their use of the NCAA Basketball Marks constituted nominative fair use. *Id*.

The NCAA responded on March 17, 2026, in a letter stating that upon further investigation they discovered additional uses of the NCAA Basketball Marks which they believed were unauthorized (Filing No. 18-21). DraftKings nonetheless took down all the NCAA's logos from their sportsbook and websites and agreed that they will no longer use them. The NCAA then reasserted the above four demands. *Id*.

As of March 22, and 23, 2026, various other betting platforms also display the NCAA Basketball Marks in connection with their online wagering platforms. Including, for example, FanDuel, BetMGM, Bet365, Fanatics, and Bet Rivers (Filing No. 52-1 at 3–8). Moreover, as of those same dates, the NCAA Basketball Marks appeared on webpages from FanDuel Sportsbook, FanDuel Research, BetMGM, Caesars Palace, Bally Bet, Bet365, Fanatics Sportsbook, Action Network, and BetUS (Filing No. 52-2 at 3–11). As of March 22, 2026, X posts containing the NCAA Basketball Marks were made by FanDuel Sportsbook, FanDuel, BetMGM, Jackbit, and Action Network (Filing No. 52-3 at 3–24).

In the NCAA's declaration filed this morning, their Associate Counsel states that they have now contacted all of the above betting platforms to execute a cessation of the uses described above (*see* Filing No. 56). At the hearing, NCAA's counsel reported that some of the examples are cached images that are no longer being used and some were just random social media posts by individuals.

F.    **Procedural Posture**

The NCAA filed their Complaint on March 20, 2026 (Filing No. 1). That same day, the NCAA filed the instant Motion for TRO and requested oral argument (Filing No. 3). DraftKings was provided notice, and the parties met with the Magistrate Judge (Filing No. 37). The NCAA filed its brief in support of the Instant Motion, (Filing No. 15), and DraftKings timely filed their response (Filing No. 51) and the Court promptly heard oral argument.

## II.    LEGAL STANDARD

A.    **Temporary Restraining Order Standard**

Federal Rule of Civil Procedure 65(b) provides that a temporary restraining order may be issued without notice to the adverse party only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(d) (emphasis added). In this case, DraftKings has been put on notice regarding NCAA's Motion for TRO and have had an opportunity to respond in writing and at oral argument. When a defendant has notice of a motion for a temporary restraining order and opportunity to respond, the standards that apply to preliminary injunction orders also apply to temporary restraining orders. *Loveless v. Chi. Bd. of Election Comm'rs*, No. 04 C 5671, 2004 WL 2095662, at *2 (N.D. Ill. Sep. 8, 2004).

To obtain a temporary restraining order, the moving party has the burden of showing that "it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that issuing an injunction is in the public interest." *Smith v. Executive Dir. Of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 286 (7th Cir. 2014). The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S.*

*of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008), *abrogated on other grounds by Nken v. Holder*, 556 U.S. 418, 434 (2009). A temporary restraining order "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Goodman v. Ill. Dep't of Fin. & Prof'l Regul.*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (granting preliminary injunctive relief is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it").

### III.   DISCUSSION

To obtain emergency TRO relief, the NCAA must establish: (1) a likelihood of success on the merits; (2) they are likely to suffer irreparable harm; (3) the balance of equities tips in their favor; and (4) that issuing an injunction is in the public interest. *Smith*, 742 F.3d at 286. The Court will proceed to each element in turn.

### A.   Likelihood of Success on The Merits

The NCAA alleges the following claims: Count I: Trademark Infringement in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; Count II: Trademark False Association and Unfair Competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and Count III: Federal Trademark Dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) (Filing No. 1). The NCAA discusses Counts I and II together before turning to Count III. The Court finds this reasonable as the standard is the same, *see Packman v. Chicago Tribune Co.*, 267 F.3d 628 (7th Cir. 2001), and thus will proceed accordingly.

### 1.   False Association Under the Lanham Act

Section 43(a) of the Lanham Act prohibits in relevant part any person from using in commerce any word, name or design, or any false or misleading description, that is likely to cause

confusion as to the affiliation, connection, or association of such person with another, or as to the origin, sponsorship, or approval of its goods, services or commercial activities. *See* 15 U.S.C. § 1125(a)(1). Likewise, Section 32 of the Lanham Act similarly prohibits in relevant part the use in commerce or any copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services that is likely to confusion or mistake, or to deceive. *See* 15 U.S.C. § 1114(1)(a).

To prevail on a claim under Section 43(a) or Section 32 of the Lanham Act, the NCAA must establish: (1) that it has a protectible trademark, and (2) that DraftKings' conduct creates a likelihood of confusion. *Packman*, 267 F.3d at 638. The NCAA argues that their marks are unquestionably protectible because each of the NCAA Basketball Marks are protected by federal trademark registrations, most of which have become incontestable under 15 U.S.C. § 1065 (Filing No. 15 at 12). DraftKings does not dispute that the NCAA has protectible trademarks for the NCAA Basketball Marks.

A registration "shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce . . . " 15 U.S.C. § 1115(a). A registration that has become incontestable under Section 1065 "shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b). The Court concludes that the NCAA has protectible trademarks in the NCAA Basketball Marks. Accordingly, the remaining question is whether DraftKings' use creates a likelihood of confusion.

The Seventh Circuit employs a seven factor test to determine the likelihood of confusion: (1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3)

11

the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiffs. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897–98 (7th Cir. 2001).

### a. <u>Similarity of the Marks</u>

The NCAA contends that DraftKings' use is not merely similar but virtually identical (Filing No. 15 at 13). The NCAA asserts that the registered marks include MARCH MADNESS®, FINAL 4®, ELITE EIGHT®, and NCAA SWEET 16® while the DraftKings betting app and online betting platform use "MARCH MADNESS", "FINAL 4", "ELITE 8", and "SWEET 16". *Id*. The NCAA argues that this similarity is more than sufficient to weigh heavily in favor of granting the NCAA relief. *Id*. (citing *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000) (holding HERBROZAC "strikingly similar" to PROZAC, where the junior mark contained five of the six letters of the senior mark) and *Ty, Inc.*, 237 F.3d at 898–99 (holding BEANIE RACER confusingly similar to BEANIE BABIES)).

DraftKings argues that their use is entirely referential and there is no substitute for the terminology DraftKings uses (Filing No. 51 at 27). DraftKings argues that the NCAA's proposed alternatives—"NCAA Tournament" or "Division I" "college basketball" tournament—are not only cumbersome but ambiguous as multiple NCAA tournaments occur simultaneously. The Court disagrees.

The challenged terms are clearly similar to the NCAA Basketball Marks. Moreover, the NCAA is correct that DraftKings need not refer to "March Madness" or "Final Four" or the other uses. Rather, DraftKings can easily refer to the Tournaments by their common names. For example, the "Final Four" can simply be the "Men's Divisions I Semi-Finals." This is clear as other betting

platforms, such as Kalshi, are identifying the rounds as their common names such as "Men's Round of 16 Qualifiers" and "Men's Round of 8 Qualifiers" (Filing No. 18-10 at 2–4, Filing No. 18-11 at 2–6, Filing No. 18-12 at 2–7, Filing No. 18-13). Moreover, DraftKings themselves has referred to the Tournaments as simply "NCAA Tournament" in its social media posts. Thus, they do not need to use "March Madness" or "Final Four."

### b. **Similarity of the Products**

For the similarity of the products element, the NCAA argues that "the parties need not be in direct competition and their goods and services need not be identical." (Filing No. 15 at 13) (quoting *Forum Corporation of North America v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990)). Rather, it is sufficient that the relevant consumers would believe that DraftKings' gambling services are "affiliated with, connected with or sponsored by" the NCAA. *Id.* (quoting *Ty, Inc.*, 237 F.3d at 900). The NCAA contends that it operates its Corporate Champions and Partners program, through which certain corporate sponsors and affiliates are authorized to use the NCAA Basketball Marks under strict quality control standards. As such consumers are accustomed to encountering authorized use of the NCAA Basketball Marks by licensed partners and affiliates. The NCAA concludes that under these circumstances, consumers would naturally and reasonably expect that an association or sponsorship exists between the entity that produces the Tournaments and the entity that brands its gambling services with the Tournaments' trademarks. *Id.*

DraftKings argues that their services are not similar in any confusion-producing sense because the NCAA operates basketball tournaments whereas DraftKings operates a sportsbook and sports-media platform. The Court disagrees.

As stated above, the services need only be similar enough that the relevant consumers would believe DraftKings and the NCAA are affiliated. This is the case here. The market audience

in the exact same—college basketball fans across the United States. Moreover, by DraftKings using the NCAA Basketball Marks in connection with betting on the games, consumers are likely to be confused as to whether there is an affiliation between the two entities.

### c. Area of Concurrent Use

Next, the NCAA argues that there is complete overlap in the area and manner of concurrent use: both services revolve around the Tournaments and both services target the same consumers—college basketball fans across the United States (Filing No. 15 at 14). The NCAA further contends that both services are advertised and provided through the same channels nationwide including but not limited to internet advertisements and social media advertisements. And, DraftKings' use of the NCAA Basketball Marks in its metatags and search engine optimization makes it even more likely, if not unavoidable, that those searching for MARCH MADNESS® or another of the NCAA Basketball Marks will encounter advertisements for both services. *Id*.

DraftKings does not contest that there is a complete overlap and the Court agrees. For obvious reasons, betting on the Tournaments is concurrent to the actual Tournaments. Thus, this factor weighs in favor of confusion.

### d. Degree of Care Likely to Be Used

Concerning the degree of care likely to be used by consumers element, the NCAA argues that sports bettors and sports fans may not be able to distinguish between official sponsors and unauthorized users (Filing No. 15 at 14). They argue that the Seventh Circuit has recognized that where there is no evidence that consumers exercise extraordinary care, the degree-of-care factor does not weigh in the defendant's favor. *Id*. (citing *Eli Lilly*, 233 F.3d at 463). The NCAA further contends that both services are widely accessible to consumers across the nation and are inexpensive which weighs in favor of a likelihood of confusion. *Id*. (citing *AutoZone, Inc. v. Strick*,

14

543 F.3d 923 (7th Cir. 2008) ("[T]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases.") The NCAA asserts that confusion is particularly likely here where DraftKings presents its gambling platform under the banner of the NCAA Basketball Marks. *Id*.

DraftKings argues that the degree of consumer care weighs against confusion because DraftKings users know and follow the sport and are unlikely to mistake a plainly branded DraftKings Sportsbook platform for an NCAA product simply because it uses the phrase "March Madness" to identify the event or particular round of an event on which they are betting (Filing No. 51 at 25). DraftKings also argues that the betting process—which requires three separate selections, across three separate screens to successfully enter a bet on a March Madness game on DraftKings Sportsbook platforms—demonstrates that consumers exercise care.

The Court does not find that sports bettors are a group which are more likely than the ordinary person to exert extraordinary care. While DraftKings is almost certainly correct that *some* sports bettors exercise a great deal of care when placing their bets, it is likely that the vast majority do not. This is especially true considering DraftKings minimum bet is $0.10. The Court finds it unlikely that an individual would exercise a higher level of care when such a bet is placed.

### e.   **The Strength of the NCAA's Marks**

The NCAA argues that "the stronger the mark, the more likely it is that encroachment on it will produce confusion." (Filing No. 15 at 15 (quoting *AutoZone, Inc.*, 543 F.3d at 933). The NCAA contends that the NCAA Basketball Marks are protected by valid and incontestable federal trademark registrations and are among the most recognized trademarks in American sports. For example, the Tournaments reach tens of millions of viewers each year and the NCAA's revenue

from multimedia and marketing rights to the men's Division I tournament reaches over $900 million annually. *Id*.

DraftKings does not contest the strength of the NCAA Basketball Marks. Rather, they collapse this element into their argument concerning the similarity of the marks element (Filing No. 51 at 26). The Court finds that the NCAA Basketball Marks are clearly strong.

### f. **Actual Confusion**

The NCAA argues that it need not prove that actual confusion occurred when the other factors point to a likelihood of actual confusion (Filing No. 15 at 16). The NCAA argues that this is especially true given the emergency nature of the need for relief leaving the NCAA with little time to obtain evidence. The NCAA nonetheless provides comments on social media platforms indicating persons' beliefs that the NCAA and DraftKings are working together. *Id*.

DraftKings argues that actual confusion is one of the most important factors in this case (Filing No. 51 at 23). DraftKings contends that despite years of widespread, public, and highly visible use, the NCAA identifies no instance of actual consumer confusion—no complaint, inquiry, or misdirected communication suggesting even one user believes DraftKings' Sportsbook platforms or DraftKings Network is affiliated with, or sponsored or endorsed by, the NCAA.

At this stage of the proceedings, the Court is uncertain whether there is actual confusion in this case, but this factor does not weigh as heavily against the NCAA as it might were the parties to have conducted discovery. It is true that the absence of evidence of actual confusion after longstanding use of a trademark weighs against confusion, but without discovery, and with the parties expedited timeline concerning this TRO, the Court finds that this factor is neutral.

### g.  **Intent**

Lastly, the NCAA argues that DraftKings' decision to use the identical NCAA Basketball Marks to promote its gambling services during the exact period of the Tournaments is not by accident. Nor is its decision to use the marks, including the NCAA's design marks, frequently and pervasively, in connection with virtually all of its advertisements relating to the Tournaments (Filing No. 15 at 16). The NCAA adds that this deliberate and intentional copying evinces DraftKings' overall intent to create the perception of association with or sponsorship by the NCAA and DraftKings' removal of the most egregious of its infringements does not negate this clear intent. *Id.*

DraftKings argues that a defendant's intent is one of the "most important" factors, and the NCAA cannot show that DraftKings intended to create confusion (Filing No. 51 at 24 (quoting *Forest Rive, Inc.*, 699 F. Supp. 3d 712, 728 (N.D. Ind. 2023) and citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 678 (7th Cir. 2001)). DraftKings contends that it uses the challenged terms to identify the tournament and its rounds so that users can understand the events on which they are placing bets, and such conduct mirrors widespread industry practice, further confirming the absence of any intent to confuse. *Id.* (citing *SportFuel, Inc. v. PepsiCo, Inc.*, 932 F.3d 589, 600–01 (7th Cir. 2019)). DraftKings further argues that it uses the challenged marks in the same style, font, and color alongside similar references to other sporting events and are used solely to identify those events, and it does not use more of the NCAA Basketball Marks than are reasonably necessary to identify the NCAA's product.

The evidence before the Court supports that DraftKings intended to use the NCAA Basketball Marks to profit off the fame of the Tournaments' fame. As noted earlier, DraftKings does not need to use the NCAA Basketball Marks and other betting platforms have taken their uses

down. DraftKings used the NCAA Basketball Marks to associate itself with the Tournaments and thus, is likely to cause confusion.

### h. Likelihood of Confusion Conclusion

On balance, the Court finds that the seven factors clearly favor the NCAA and indicate a likelihood of confusion. Virtually every factor besides actual confusion weighs in favor of confusion and as the Court discussed above, that factor is neutral. Accordingly, the Court finds that because there is a likelihood of confusion, the NCAA is likely to succeed on the merits of their false association claims.

### 2. Dilution Under the Trademark Dilution Revision Act

This brings the Court to the NCAA's dilution of their trademarks claim. 15 U.S.C. § 1125(c)(1) states in relevant part,

> [T]he owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

*Id*. To prevail on a claim of trademark dilution, the NCAA must establish: (1) the NCAA Basketball Marks are famous; (2) DraftKings' use in commerce began after the NCAA Basketball Marks became famous; and (3) DraftKings' use is likely to cause dilution of the NCAA Basketball Marks. *Id*; *see Eli Lilly*, 233 F.3d at 466; *see also H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1042 (W.D. Wis. 2018). The Court will address each element in turn.

### a. Fame of NCAA Basketball Marks and Use Prior to Fame

The NCAA begins by arguing the first to points together. The NCAA contends that while it will contend that all of the NCAA Basketball Marks are famous within the meaning of 15 U.S.C. § 1125(c), there is no dispute that the MARCH MADNESS® and FINAL FOUR® marks are

(Filing No. 15 at 18). The NCAA points out that "[a] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the marks' owner." *Id*. (quoting 15 U.S.C. § 1125(c)(2)). The NCAA contends that for more than four decades, the NCAA has used these marks continuously and extensively, throughout the United States and internationally, in connection with the Tournaments and related services. The NCAA contends that it and its corporate sponsors and affiliates have invested hundreds of millions of dollars in marketing and promotional value associated with the NCAA Basketball Marks. The NCAA contends that these efforts have caused the MARCH MADNESS® and FINAL FOUR® marks to garner massive publicity for more than 40 years which is more than sufficient to make them famous. The NCAA adds that previous courts have held MARCH MADNESS® and FINAL FOUR® to be famous long before DraftKings' use of those marks. *Id*. (citing cases).

DraftKings does not dispute the fame of the NCAA Basketball Marks, and the Court finds that they are clearly famous. The Court also finds that DraftKings clearly used the NCAA Basketball Marks after they became famous. Accordingly, the only question left is the likelihood of dilution.

### b. **Likelihood of Dilution**

"Dilution by tarnishing occurs when a junior mark's similarity to a famous mark causes consumers mistakenly to associate the famous mark with the defendant's inferior or offensive product." *Eli Lilly*, 233 F.3d at 466 (citation omitted). The NCAA argues that the unauthorized use of a trademark in connection with gambling can support a dilution by tarnishment claim (Filing No. 15 at 20). The NCAA contends that the MARCH MADNESS® and FINAL FOUR® marks— which represent the prestige, excitement, and integrity of collegiate athletics—are being used by a sportsbook for gambling. The NCAA continues that it expressly prohibits "sports wagering" and

"organizations or companies primarily involved in gambling or gaming business activities" from association with the NCAA or its event. The NCAA argues that the harm to its reputation flows directly from this association: consumers who encounter the MARCH MADNESS® brand in a gambling context will associate the marks—and by extension the NCAA and its mission—with the gambling industry, undermining the very message the NCAA has spent decades cultivating through its policies, its Draw the Line program, and its public advocacy. *Id.*

DraftKings argues that the NCAA's dilution claim fails for the same reasons as its false association claims (Filing No. 51 at 30). DraftKings also contends that the NCAA's dilution claim is barred by the nominative fair use doctrine which the Court will discuss below.

The Court finds there is a likelihood of dilution. Consumers who encounter sports betting platforms using the NCAA Basketball Marks are likely to associate the NCAA with sports betting. Those same consumers might then see the NCAA state that it expressly prohibits association with sportsbooks and think that the NCAA is talking out of both sides of its mouth; that they are merely claiming to be free of association with sports betting all while profiting tremendously off the very sportsbooks they claim to oppose.

Accordingly, the Court finds that the NCAA is likely to succeed on all three elements of their dilution claim.

### 3. Nominative Fair Use Defense

DraftKings argues that the NCAA's trademark dilution claim also fails because DraftKings' use falls under the nominative fair use defense (Filing No. 51 at 30). The "nominative fair use defense" was first announced by the Ninth Circuit Court of Appeals in *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992). The Ninth Circuit has explained the distinction between " 'classic fair use,' in which 'the defendant has used the plaintiff's mark to

describe the defendant's *own* product,' and 'nominative fair use,' in which the defendant has used the plaintiff's mark 'to describe the *plaintiff's* product' for the purposes of, for example, comparison to the defendant's product." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002) (emphasis in original) (quoting *New Kids*, 971 F.2d at 308). In the Ninth Circuit, "classic fair use" and "nominative fair use" are governed by different analyses; classic fair use applies the familiar "likelihood of consumer confusion" test, and nominative fair use applies a distinct three-element test. *Id.* at 1150–51. The NCAA argues that the nominative fair use defense does not apply, and even if it did, the NCAA cannot make the requisite showing (Filing No. 15 at 23).

The Seventh Circuit has not adopted the nominative fair use defense, and while DraftKings contends that they have made the requisite showing, they do not argue why the Court should adopt it beyond simply stating that Congress created such defense (Filing No. 51 at 30 (citing 15 U.S.C. § 1125(c)(3)(A)). In *World Impressions, Inc. v. McDonald's Corp.*, 235 F. Supp. 2d 831 (N.D. Ill. 2002), the Northern District of Illinois applied a "classic" fair use defense and cited *New Kids* only for the general proposition that descriptive language falls outside trademark protections because " 'no one should be able to appropriate descriptive language through trademark registration.' " *Id.* at 843 (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 951 (7th Cir. 1992)); *accord Swarovski Aktiengesellscahft v. Building No. 19, Inc.*, 704 F.3d 44, 49–50 (1st Cir. 2013) ("[W]e have recognized the 'underlying principle' of nominative fair use, but like several other courts, we have never endorsed any particular version of the doctrine.").

In *Data Management Association International v. Enterprise Warehousing Solutions, Inc.*, No. 20 C 4711, 2020 WL 7698368 (N.D. Ill. Dec. 28, 2020), the Northern District of Illinois again declined to adopt any circuit's nominative fair use defense, but it nevertheless considered the three elements of the Ninth Circuit's nominal fair use defense because "[l]ikelihood of confusion is a

21

fact-intensive inquiry," and in cases of "nominative" use, many of the traditional factors are inapplicable. The *Data Management* court explained its reasoning in detail:

> The Seventh Circuit has not addressed the nominative fair use defense; as a result, there is no binding precedent guiding this Court's application of the nominative fair use factors in relation to the traditional likelihood of confusion test. *And on that issue, circuits have not only split, but splintered*. The Third Circuit treats nominative fair use as an affirmative defense, and directs courts to consider the three factors only after the plaintiff has made a showing of likelihood of confusion under a modified version of the traditional analysis. The Second Circuit has similarly concluded that the nominative fair use factors should supplement, rather than supplant, the traditional factors. But the Ninth Circuit and other courts have observed that the traditional factors should not be used at all in nominative fair use cases, because "often many of the factors 'are either unworkable or not suited or helpful as indicators of confusion in this context.' " ... *Because the unhelpfulness of the traditional likelihood of confusion factors in this case renders the nominative fair use factors dispositive, the Court need not endorse one circuit's approach.*

*Id.* at *2 n.1 (emphases added) (citations omitted).

The Northern District of Indiana applied similar reasoning in *Dwyer Instruments, Inc. v. Sensocon, Inc.*, 873 F. Supp. 2d 1015 (N.D. Ind. 2012). That court explained that "although the Ninth Circuit's approach has not been universally adopted, several courts have recognized that, in the context of a referential or nominative type of use, the application of the traditional multi-factor test is difficult because often many of the factors are either unworkable or not suited or helpful as indicators of confusion in this context." *Id.* at 1030 (cleaned up) (quotation marks and citations omitted). The *Dwyer* court specifically cited the Fourth Circuit's decision in *Rosetta Stone*, which explained why certain factors, like "the similarity of the marks and the strength of the plaintiff's mark are of limited value in such cases":

> Consideration of the similarity of the marks will *always* suggest the presence of consumer confusion—the mark used will always be *identical* "because, by definition, nominative use involves the use of *another's* trademark in order to describe the trademark owner's *own* product." The similarity factor does not account for context and "leads to the incorrect conclusion that virtually all nominative uses are confusing."

22

*Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 154 (4th Cir. 2012) (emphases in original) (internal citation omitted) (quoting *Century 21 Real Est. Corp. v. Lendingtree, Inc.*, 425 F.3d 211, 224 (3d Cir. 2005)). The *Dwyer* court ultimately decided to apply the standard seven-factor likelihood of consumer confusion test, "modified for nominative fair use in the context of comparative advertising." *Dwyer*, 873 F. Supp. 2d at 1031.

The Court is persuaded by the *Dwyer* court's reasoning and declines to endorse or adopt a nominative fair use defense. The Seventh Circuit has not adopted this defense and has not indicated any likelihood that it will. As the *Dwyer* court noted, "[t]he Seventh Circuit has not ruled on the applicability of the nominative fair use defense, and has not referenced it even in the context of a defendant's use of a mark to describe the plaintiff's product." *Id.* (citing *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995). Instead, in *August Storck*, the Seventh Circuit "considered the defendant's use of the plaintiff's mark to be comparative advertising, and noted that it was beneficial to consumers because they could 'learn at a glance what kind of product is for sale and how it differs from a known benchmark.' " *Id.* at 1030–31 (quoting *August Storck*, 59 F.3d at 618). The Seventh Circuit's decision in *August Storck* shows that its seven-factor test can more than adequately address cases of "nominal" or "referential" trademark use, and there is no need to adopt a separate nominative fair use defense. District courts are given broad discretion in determining how to weigh the seven factors to accommodate the fact-sensitive inquiry of likelihood of consumer confusion. In cases of alleged nominative use, factors like the similarity between marks and products or the strength of the plaintiff's marks may carry less weight, and factors like degree of care, actual confusion, and the defendant's intent may carry more. Because the Court declines to adopt the nominative fair use defense, DraftKings' nominative fair use defense fails.

23

B.        **Irreparable Harm**

"Trademark law affords a rebuttable presumption of irreparable harm to movants who show they are likely to succeed on the merits of their trademark infringement claims." *Illinois Tamale Co., Inc. v. LC Trademarks, Inc.*, 164 F.4th 648, 654 (7th Cir. 2026) (citing 15 U.S.C. § 1116(a)). This presumption "is based upon the judgment that it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damages to reputation and loss of goodwill, caused by such violations." *Country Inns & Suites by Carlson, Inc. v. Nayan, LLC*, No. 1:08-cv-624, 2008 WL 4735267, at *6 (S.D. Ind. 2008) (quoting *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992)).

The NCAA contends that irreparable harm here is not only presumed but is especially acute (Filing No. 15 at 27). Preserving the integrity of athletic competition is a foundational principle of the NCAA and a central component of its mission. Thus, when consumers encounter the NCAA Basketball Marks in connection with DraftKings' gambling services, they are likely to perceive an affiliation between the NCAA and the gambling industry, thereby distorting the NCAA's identity and undermining decades of deliberate efforts to promote policies, programs, and public messaging designed to separate collegiate athletics from commercial gambling. *Id*. The NCAA argues that DraftKings' continued unlawful use of the NCAA Basketball Marks during the ongoing Tournaments, a period of peak public attention, exacerbates the erosion of NCAA's anti-gambling principles and public confidence, and it inflicts continuing and compounding damages to the NCAA's reputation and goodwill. *Id*.

In response, DraftKings argues that the NCAA cannot make a clear showing that it will suffer irreparable harm if the TRO is not granted because it waited more than five years before filing this lawsuit and requesting a TRO halfway through this year's Tournaments (Filing No. 51

24

at 17). DraftKings argues that they have openly and publicly used "March Madness," "Sweet 16," "Elite Eight," and "Final 4" to identify NCAA tournament events since 2021. Moreover, the parties have corresponded for years about trademark issues, but the NCAA never once complained about anything other than "March Mania" until a few weeks ago. DraftKings argues that specifically for this year's Tournaments, DraftKings launched futures bets on the "Final 4" as early as September 2025. *Id*.

DraftKings contends that the NCAA seeks refuge in a rebuttable presumption of irreparable harm but "that presumption can be negated by delay in seeking a preliminary injunction." *Id*. (quoting *TWD, LLC v. Grunt Style LLC*, 18 C 7695, 2023 WL 7095011, at *4 (N.D. Ill. Mar. 23, 2023)). DraftKings asserts that courts routinely hold that "[s]ignificant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial." *Id*. (quoting *Citybank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d. Cir. 1985)). Even a few months of dithering can defeat irreparable harm, *id*. (citing *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018) (citing cases)), and the "longest such delay ever permitted by the Seventh Circuit appears to be nine months." *Id*. (quoting *Redbox*, 310 F. Supp. 3d at 953). DraftKings contends that the NCAA's years-long delay, for which it offers no excuse, explanation, or even mention of, is far longer than prudence can bear.

DraftKings then turns to the NCAA's claimed reasons for irreparable harm. *Id*. at 19. DraftKings states that the NCAA tells the Court that one of its most deeply held institutional values is that sports wagering must not be associated with or endorsed by the NCAA but, at the same time, proclaims that it does not object to use of the phrase "NCAA Tournament" in connection with sports betting. Nor could it as the NCAA appointed Genius as the exclusive distributor of official

NCAA data to licensed sportsbooks for all post-season tournaments, including March Madness, through 2032. DraftKings contends that the NCAA cannot possibly suffer irreparable harm if DraftKings continues to identify events on which consumers can lawfully bet in the exact same way it and countless third parties have for years. DraftKings concludes by arguing that this is at least the fifth tournament during which it has made the same "use" of all the challenged terms yet the first and only time the NCAA has filed suit was last Friday. *Id*. at 20.

In support of their contentions, DraftKings submitted evidence that it has been using "March Mania" since 2019, "March Madness" since at least 2021, and "Sweet 16," "Elite Eight," and "Final Four" since 2023 (Filing No. 53 at 3–12, Filing No. 53-1–53-9). It is reasonable to expect that this open use by one of the largest betting platforms in the United States could have been discovered by reasonable diligence. It is difficult for the Court to credit the claim that the NCAA—who, by its own admission, is diligent, rigorous, and consistent in enforcing its trademarks, and utilizes a combination of commercial monitoring services, periodic monitoring of the marketplace, staff members, community members, and corporate partners and affiliates to identify infringements of its trademarks—did not know about DraftKings challenged use of the NCAA Basketball Marks until the NCAA's Associate Counsel, who is responsible for overseeing the NCAA's trademark portfolio, inexplicably decided to "conduct[] a search on the Bing search engine for 'march madness draftkings.'" (Filing No. 17 at 11).

Moreover, while counsel for the NCAA characterized the proffered evidence concerning DraftKings' uses in 2021 and 2023 as sparse, the evidence nonetheless shows that DraftKings has continued to use the NCAA Basketball Marks every year in relation to its sportsbook and websites.

The NCAA argued at oral argument that DraftKings attorney concealed DraftKings' use by claiming that they were "not using 'March Madness' at all, but 'March Mania,'"in the May 13, 2025,

letter (Filing No. 53-13 at 3). However, that letter was in reference to the NCAA's taking issue with DraftKings' use of the phrase "March Mania" in their marketing. It is difficult to credit that the NCAA did virtually no investigation of their own into whether DraftKings was using the phrase "March Madness" but relied entirely on the limited statements—evidenced by the preceding language of "[i]n the present case"—in a letter concerning only the use of the phrase "March Mania." *Id*.

DraftKings was not obligated to spell out every possible infringement of the NCAA's trademarks to it. And even if they were, and even if the attorney's statements in the letter were somehow binding on DraftKings for all uses up to May 13, 2025, the evidence supports that DraftKings began using the phrase "Final 4" in wagering options offered to the public in September 2025 (Filing No. 53 at 7). Thus, even if DraftKings open use of the NCAA Basketball Marks was limited to this year alone, the NCAA still waited more than six months to request for emergent relief. Indeed, even a few months can be too long; the "longest such delay ever permitted by the Seventh Circuit appears to be nine months." *Redbox*, 310 F. Supp. 3d at 953. At this stage of the proceedings, the NCAA has not shown a likelihood of irreparable harm absent the issuance of a TRO.

## C.    <u>Balance of Equities and Public Interest</u>

The Court briefly notes it's belief the balance of equities and the public interest are in the NCAA's favor. But because NCAA has not shown a likelihood of irreparable harm absent the issuance of a TRO, the Court need not address these two factors at this time.

## IV.    CONCLUSION

The NCAA has made the requisite showing that three of the four elements necessary for a TRO exists, but given the exacting standard required for a temporary restraining order, they have not shown irreparable harm. With further discovery the NCAA may be able to show they are entitled to a preliminary or permanent injunction, and those claims remain pending. On the record before the Court, the NCAA's Motion for Temporary Restraining Order (Filing No. 3) is **DENIED**.

**SO ORDERED**.

Date:    3/26/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Megan Bannigan
Debevoise & Plimpton LLP
mkbannigan@debevoise.com

David H. Bernstein
Debevoise & Plimpton LLP
dhbernstein@debevoise.com

Kaylin Oldham Cook
McCarter & English
kcook@mccarter.com

Thomas H. Dupree
Gibson, Dunn & Crutcher LLP
tdupree@gibsondunn.com

Howard S Hogan
Gibson, Dunn & Crutcher LLP
hhogan@gibsondunn.com

Ryan Michael Hurley
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
ryan.hurley@Faegredrinker.com

Kenneth Lee Marshall
Bryan Cave Leighton Paisner LLP
lee.marshall@bclplaw.com

Matthew G Minder
Bryan Cave Leighton Paisner LLP
matt.minder@bclplaw.com

Alice McKenzie Morical
Faegre Drinker Biddle & Reath LLP
alice.morical@faegredrinker.com

Zachary A. Myers
zmyers@mccarter.com

Ilissa Samplin
Gibson, Dunn & Crutcher LLP
isamplin@gibsondunn.com

Christopher J Schmidt
Bryan Cave LLP
christopher.schmidt@bclplaw.com

Jacob T. Spencer
Gibson, Dunn & Crutcher LLP
jspencer@gibsondunn.com